# LEVINDALE LEAD AND ZINC MINING COM-PANY *v.* COLEMAN.

## ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 322. Argued April 25, 1916.—Decided June 5, 1916.

A statute should, if possible, be construed in the light of its obvious policy; and as restrictions against alienation of Indian allotments evince a continuance of the policy of guardianship over Indians which does not embrace persons not of Indian blood, it would require clear language to show an intent to impose restriction on allotted lands of non-Indians even if inherited from Indians.

Restrictions, such as those contained in the Osage Indian Allotment Act of 1906, do not run with the land until they attach, and then only in accord with the intendment of the Act.

A legislative declaration of the intent of a previous act is not absolutely controlling; and in this case *held,* that later acts of Congress in regard to Osage Indian allotments did not attempt to import into the earlier act a restriction which lay wholly outside of its express terms and the policy it was intended to execute.

The restriction on alienation provisions of the Osage Indian Allotment Act of June 28, 1906, c. 3572, 34 Stat. 539, do not apply to lands, or interests in lands, coming lawfully into ownership of white men who are non-members of the Osage tribe.

43 Oklahoma, 13, reversed.

THE facts, which involve rights of a white heir of an Osage Indian to the allotment of the latter, and the construction of the Act of June 28, 1906, under which the allotment was made, are stated in the opinion.

*Mr. H. P. White* for plaintiff in error.

*Mr. Preston A. Shinn* for defendant in error.

Mr. Justice Hughes delivered the opinion of the court.

Charles Coleman, the defendant in error, brought this suit to set aside a conveyance of an undivided interest in lands inherited from his Indian wife and child who were members of the Osage Tribe. Judgment was entered annulling the conveyance upon the ground that it was executed in violation of restrictions imposed by Congress. The judgment was affirmed by the Supreme Court of the State (43 Oklahoma, 13), and this writ of error has been sued out.

The case was decided upon a motion for judgment on the pleadings, and there were special findings of the facts which the pleadings disclosed. It appears that the plaintiff, Charles Coleman, was a white man, lawfully married to an Indian woman, Mary Chesewalla; that their child, Joseph Coleman, was born on February 27, 1906, and died on the same day, leaving his father and mother his sole heirs; that his mother died intestate on February 28, 1906, leaving as her sole heirs Charles Coleman, Herbert Chesewalla and Floyd Chesewalla; that both decedents were duly enrolled as members of the Osage Tribe and were entitled to allotments under the act of Congress of June 28, 1906, c. 3572, 34 Stat. 539; and that, after their death, allotments were made in their right to the heirs of each respectively, the allotment deeds being approved by the Secretary of the Interior and recorded in the year 1909. By the death of his wife and child the plaintiff took title as heir to an undivided one-half interest in the lands allotted in the right of the former, and to an undivided three-fourths interest in lands allotted in the right of the latter. These lands have not been partitioned. In February, 1909, Charles Coleman conveyed by warranty deed his undivided interest to the defendant (plaintiff in error) The Levindale Lead and Zinc Mining Company. It is further set forth that his wife had not received

a certificate of competency. There was no finding and no basis in the record for a finding that Charles Coleman was a member of the Osage Tribe by adoption, enrollment or otherwise.

The lands prior to the allotment were Indian lands (Act of June 5, 1872, c. 310, 17 Stat. 228) and there is no controversy as to the power of Congress in providing for allotments to impose restrictions upon alienation. The question is as to the construction of the provisions of the allotment act of June 28, 1906.

That act provided, 34 Stat. 539, 540, that the roll of the Osage Tribe as it existed on January 1, 1906, with the additions specified, should be the roll of the tribe and constitute its 'legal membership.' Children born between January 1, 1906, and July 1, 1907, to persons whose names were on the roll on the first mentioned date, "including the children of members of the tribe who have, or have had, white husbands," were to be recognized as members for the purposes of the division. (§ 1.) All lands were to be divided "among the members of said tribe, giving to each his or her fair share thereof in acres" as specifically set forth; that is, "each member" as shown by the roll was to be allowed to make three selections of 160 acres each in the manner described. (§ 2.) Restrictions were imposed as follows:

"Each member of said tribe shall be permitted to designate which of his three selections shall be a homestead, and his certificate of allotment and deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable until otherwise provided by Act of Congress. The other two selections of each member, together with his share of the remaining lands allotted to the member, shall be known as surplus land, and shall be inalienable for twenty-five years, except as hereinafter provided." (§ 2, Fourth.)

After 'each member' had made the three selections, the

remaining lands of the tribe, except as stated, were to be divided "as equally as practicable among said members by a commission to be appointed." (§ 2, Fifth.) The Secretary of the Interior in his discretion, at the request of any "adult member of the tribe" was to issue "to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this Act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee," if upon investigation "he shall find any such member fully competent" to care for his affairs. It was provided that upon the issuance of such a certificate of competency the lands of such 'member,' except homestead lands should "become subject to taxation" and that "such member," except as provided, should have the right to "manage, control and dispose of his or her lands the same as any citizen of the United States." It was further provided that the surplus lands should be "nontaxable" for the period of three years from the approval of the act "except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress." (§ 2, Seventh.) Oil, gas, coal or other minerals "covered by the lands" were "reserved to the Osage tribe for a period of twenty-five years." (Id.; § 3.) All funds belonging to the tribe, and moneys accruing to it were to be "held in trust by the United States for the period of twenty-five years" from January 1, 1907, except as provided. The funds of the tribe, and moneys accruing from the sale of Kansas lands together with those due upon claims against the United States, were to be segregated and placed to the credit of the "individual members" of the tribe "on a basis or a *pro rata* division" or "to their heirs as hereinafter provided," and such credit was to draw interest to be "paid quarterly to the members entitled thereto"; and the disposition of royal-

ties from mineral leases was specially prescribed. (§ 4.)
At the expiration of twenty-five years from January 1,
1907, the lands, mineral interests, and moneys held in
trust by the United States were to be the absolute prop-
erty of the "individual members" of the tribe, according
to the roll, "or their heirs, as herein provided" and deeds
were to be issued accordingly. (§ 5.) Sections 6 and 7
are as follows:

"Sec. 6. That the lands, moneys, and mineral interests,
herein provided for, of any deceased member of the Osage
tribe shall descend to his or her legal heirs, according to the
laws of the Territory of Oklahoma, or of the State in which
said reservation may be hereinafter incorporated, except
where the decedent leaves no issue, nor husband nor wife,
in which case said lands, moneys, and mineral interests,
must go to the mother and father equally.

"Sec. 7. That the lands herein provided for are set
aside for the sole use and benefit of the individual members
of the tribe entitled thereto, or to their heirs, as herein
provided; and said members, or their heirs, shall have the
right to use and to lease said lands for farming, grazing,
or any other purpose not otherwise specifically provided
for herein, and said members shall have full control of
the same, including the proceeds thereof: *Provided*, That
parents of minor members of the tribe shall have the con-
trol and use of said minors' lands, together with the
proceeds of the same, until said minors arrive at their
majority: *And provided further*, That all leases given on
said lands for the benefit of the individual members of
the tribe entitled thereto, or for their heirs, shall be sub-
ject only to the approval of the Secretary of the Interior."

Deeds to the Osage lands were to be executed by the
Principal Chief, but were not to be valid until approved by
the Secretary of the Interior (§ 8), and it was further
provided that whatever was necessary to carry into effect
the provisions of the Act should be done under the au-

thority of this officer (§ 12). Regulations have been adopted by the Secretary of the Interior governing the leasing (under §§ 7, 12) of lands "allotted to Osage Indians." These provide among other things that "lands of deceased allottees may be leased by the heirs jointly," as stated. (Regulations 11, 12, approved October 25, 1910; 8, approved June 17, 1913.)

The provisions of the Allotment Act must be construed in the light of the policy they were obviously intended to execute. It was a policy relating to the welfare of Indians,—wards of the United States. The establishment of restrictions against alienation "evinced the continuance, to this extent at least, of the guardianship which the United States had exercised from the beginning." *Heckman* v. *United States*, 224 U. S. 413, 436; *United States* v. *Kagama*, 118 U. S. 375, 384; *United States* v. *Rickert*, 188 U. S. 432, 437, 438; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 316; *Williams* v. *Johnson*, 239 U. S. 414, 420. This policy did not embrace white men—persons not of Indian blood—who were not as Indians under national protection although they might inherit lands from Indians; and, with respect to such persons, it would require clear language to show an intent to impose restrictions.

Taken in their natural sense, the provisions of the fourth paragraph of § 2 apply only to allotments made to members of the tribe. There is nothing to suggest that a non-member should designate a 'homestead,' and unless lands were thus segregated the restrictions as to 'homesteads' would not apply. With respect to 'surplus lands' it will be observed that it is only selections of each 'member,' and the share of remaining lands 'allotted to the member,' which constitute lands so described and thus come under the stated restrictions. It was early ruled administratively that under § 6 the right to the member's share, though unallotted in his lifetime passed to his legal heirs as there

defined and this we assume to be the meaning of the statute. But the fact that the non-member takes in the right of the deceased member is not enough to subject him to restrictions which are plainly imposed for the protection of members. It is urged that the restrictions, by virtue of their terms, were to run with the land until they expired by limitation or were removed (*Bowling* v. *United States*, 233 U. S. 528), but restrictions would not run with the land unless they had attached. And, even where they had attached, they would run only according to the intendment of the statute. We find no indication of an intent that they should apply to lands, or an interest in lands, which had come lawfully into the ownership of white men who were non-members of the tribe. Emphasis is placed by the defendant in error on the provisions of § 7 as to leases; but it would be an inadmissible construction of this section to say that the word 'heirs' was there used in contradistinction to 'members.' This provision as to leases, in the light of the purpose of the act, had reference we think to the 'individual members' who received allotments and the Indian heirs of such members.

The view we have taken of the inapplicability of the restrictions upon alienation in a case like the present finds support in the fact that there was no provision for giving to non-members certificates of competency. Under the seventh paragraph of § 2, any 'adult member' of the tribe, although a full-blood Indian, who could satisfy the Secretary of the Interior of his ability to transact his own business might obtain a certificate and thus be enabled to dispose of his 'surplus land'; but a competent white man, not a member, could not be relieved. It would seem to be evident that such an incongruous result was not intended, the language plainly showing that Indians alone were deemed to be subjected to the restrictions.

It is insisted that subsequent legislation *in pari materia* indicates the contrary. Reference is made to the acts

of March 3, 1909, c. 256, 35 Stat. 778, and of April 18, 1912, 37 Stat. 86. The former does not aid this contention, but is rather opposed to it. The statute authorized the Secretary of the Interior to sell "part or all of the surplus lands of any member" of the Osage tribe but contained no authority to deal with lands of non-members. It will also be observed that prior to this act there was a joint resolution of February 27, 1909, No. 19, 35 Stat. 1167, providing that "homesteads of members of the Osage tribe" may consist of land designated from any one or more "of their first three allotment selections"; this does not suggest that non-members were supposed to designate 'homesteads.' But it is the act of 1912 upon which chief reliance is placed. This was "supplementary to and amendatory of" the act of 1906, and provides, among other things, in § 6 relating to the lands "of deceased Osage allottees" that "when the heirs of such deceased allottees have certificates of competency or are not members of the tribe, the restrictions on alienation are hereby removed." We lay aside the suggestion that "deceased Osage allottees" may be taken to mean only members who received allotments in their own right while living, expressing no opinion upon that point. For not only is a legislative declaration of the intent of a previous act not absolutely controlling, but we think that in the present instance the purpose of Congress is manifest. This suit had been decided in the District Court of the State in December, 1910, and it had been there held that the restriction applied to non-members. The case had been appealed, but it may well be supposed that Congress intended to remove the restriction upon a non-member if such a restriction could be deemed to exist. That, we are satisfied, was the object of the provision, and it was not an attempt to import into the earlier act a restriction which lay wholly outside its express terms and the policy of guardianship it was intended to execute.

We confine ourselves to the single point presented. There is no controversy whatever as to the authority of the Secretary of the Interior, where there are undivided interests belonging to Indians, adequately to protect those interests according to the statutory provisions to this end. Our conclusion simply is that the act of 1906 placed no restrictions upon the alienation of land, or undivided interests in land, of which white men who were not members of the tribe became owners.

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.