## UNKLE et al. v. WILLS et al.

(Circuit Court of Appeals, Eighth Circuit. March 28, 1922. On Motion to Amend Opinion and Decree, May 23, 1922.)

No. 5918.

1. **Appeal and error ⬅847(1)—Refusal to pass on objections not reviewable in equity.**

The refusal of the court to pass on objections to evidence during the trial or at any time is not subject to review on appeal in equity cases.

2. **Appeal and error ⬅1175(7)—Equity appeals heard de novo.**

Appeals in equity are heard de novo and disposed of finally without remanding the cause for another trial, except in exceptional cases.

3. **Courts ⬅356—Under equity rule, inadmissible evidence disregarded on appeal in equity.**

If the chancellor erred in the admission of evidence objected to, the appellate court will disregard the evidence and reverse the decree, unless it can be sustained on the competent evidence, in view of equity rule 46 (198 Fed. xxxi, 115 C. C. A. xxxi).

4. **Appeal and error ⬅931(6)—Presumed that chancellor disregarded incompetent evidence.**

Where the chancellor does not pass on objections to evidence during the hearing, the appellate court will presume that in reaching his final conclusion he disregarded all incompetent evidence.

5. **Equity ⬅385—Questions to which objection sustained in equity and answers thereto should be included in record.**

Even though objections to questions are sustained in equity cases, it is the court's duty to have them answered and included in the record, so that, if the appellate court finds that the chancellor erred, the cause need not be remanded to have the testimony retaken.

6. **Indians ⬅15(2)—Evidence that allottee's widow, a white woman, held admissible on validity of deed and compromise of suit.**

Where it was contended that a deed by the widow of a Quapaw Indian allottee, and an agreement for the compromise of a suit to set it aside, were void, because not approved by the Secretary of the Interior, evidence that the widow was a white woman was admissible.

7. **Equity ⬅390—Not error to direct filing of objections to evidence after final decree, but at same term.**

The court had full control of its decree during the term, and could set aside, amend, or modify it, and hence committed no error in directing the parties, after the entry of the final decree, but during the term at which it was entered, to file objections to alleged incompetent evidence.

8. **Witnesses ⬅188(1)—Husband could not testify to private conversation with wife.**

A husband's testimony as to a private conversation between himself and his wife was properly excluded.

9. **Compromise and settlement ⬅23(3)—Deeds ⬅211(3)—Evidence of fraud must be full, clear, unequivocal, and convincing.**

To justify a court of equity in setting aside a deed of conveyance or a compromise between litigants, it is not sufficient to establish charges of fraud by a mere preponderance of the evidence; but the evidence must be full, clear, unequivocal, and convincing, especially where the compromise is of conflicting family claims.

10. **Appeal and error ⬅1009(3)—Findings of chancellor not disturbed, unless clearly wrong.**

While the findings of the chancellor in an equity case on conflicting evidence have not the conclusive effect of a verdict of a jury, or of the

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

trial judge, when a jury is waived, they are entitled to high consideration, and unless clearly against the weight of the evidence, or induced by an erroneous view of the law, they will not be disturbed, especially where the testimony was taken in open court.

11. **Equity ⬥⬦391—Error in finding cured by exclusion on amendment of findings.**
The error in a finding of fact not warranted by competent evidence was cured by its exclusion on a hearing to amend the findings.

12. **Compromise and settlement ⬥⬦23(3)—Evidence held to support findings of absence of undue influence or threats.**
Evidence *held* sufficient to warrant findings that no undue influence or threats were used towards complainants to induce them to sign an instrument compromising a suit brought to set aside a deed for fraud and duress.

13. **Evidence ⬥⬦222(1)—Admissions against interest always admissible.**
Admissions against a party's interest are always admissible, especially when represented by counsel who conducted the examination in which they were made.

Sanborn, Circuit Judge, dissenting.

### On Motion to Amend Opinion and Decree.

14. **Cancellation of instruments ⬥⬦53—Finding that deed was void held to mean that it was voidable.**
In a suit to set aside a deed as obtained without consideration, by fraud and duress, a finding that the deed was void for want of consideration and because of the manner in which it was secured meant that it was voidable, and not that it was wholly without effect.

15. **Deeds ⬥⬦75, 76—Valid until set aside, though without consideration; deed effective from execution, when subsequently ratified.**
A deed, though void for want of consideration and because of the manner in which it was secured, was good against every one, including the grantors, until set aside by a decree of a court of competent jurisdiction; and when the grantors for a valuable consideration executed an instrument reacknowledging the deed, and directing dismissal of a suit to set it aside, it became as effective from its execution and delivery as if no action to set it aside had ever been instituted.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by Mary Josephine Fish Unkle and another against Mary Wills, administratrix of Leander J. Fish, deceased, trustee for Joe P. Fish, and others. From a decree for defendants, plaintiffs appeal. Affirmed.

Paul A. Ewert, of Joplin, Mo. (Henry C. Lewis, of Washington, D. C., on the brief), for appellants.

O. L. Cravens, of Neosho, Mo. (A. Scott Thompson, of Miami, Okl., on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. For convenience the appellants will be referred to herein as plaintiffs and appellees as defendants as they appeared in the court below.

' In the original complaint the plaintiffs sought to set aside a deed executed by them on February 4, 1915, to Mary Wills, administratrix

of the esta   f Leander J. Fish, deceased, in trust for the defendant Joe P. Fi    ne only son of Leander J. Fish, deceased, whereby they conveyed the one-half interest of the plaintiff Mary Josephine, as the widow of Leander J. Fish, in and to 200 acres of land, allotted to the said Leander J. Fish, deceased, as an enrolled member of the Quapaw Tribe of Indians. The charges are that it had been obtained by fraud and duress for a nominal consideration, although the land was of great valu  $8,000 for agricultural purposes, and from $50,000 to $100,000 for   eral purposes, which facts, although well known to defendants, w    concealed from plaintiffs by Joe P. Fish and his attorney, the de  adant J. W. Swarts, and the false representations made to her, that her half interest, owing to the debts of her deceased husband, was practically of no value; that Mrs. Unkle, who had married Mr. Unkle, her then husband, during the lifetime of Leander J. Fish, although not divorced, was threatened by them with a criminal prosecution for bigamy, unless she executed a deed of conveyance to the defendants; and that in fear of such a prosecution and in ignorance of the value of the property, she and her husband, the plaintiffs herein, executed the deed for the nominal consideration of $10.

After the institution of the suit, the defendant Joe P. Fish, accompanied by his attorney, Mr. Cravens, went to plaintiffs' home in the state of Maryland, a short distance from Washington, D. C., where the plaintiffs were engaged in farming, and made a compromise and settlement of the pending suit with plaintiffs, whereby plaintiffs ratified the former conveyance, by reacknowledging it, and directed the suit, then pending, to be dismissed. Thereupon a supplemental complaint was filed, to cancel and set aside this compromise and settlement. The supplemental complaint charged that Joe P. Fish, and his attorney, upon visiting the plaintiffs in their home, again falsely represented to them the value of the property and Mrs. Unkle's interest therein, inveigled them from their home to the city of Washington, D. C., and after their arrival there, were by fraudulent and false representations induced to reacknowledge the deed theretofore executed and an order for dismissal of the suit, for the consideration of $1,000, paid to them, and the promise of a conveyance of a small house and lot in the town of Commerce, Ottawa county, state of Oklahoma.

The supplemental complaint sets out fully the alleged artifices and fraudulent representations, alleged to have been made by the defendant Fish and his attorney to the plaintiffs, which induced them to reacknowledge the original deed and the instrument compromising and directing dismissal of the suit. It is also charged that the plaintiffs are illiterate country people and lacking in will power, and did not understand what they were doing, when they signed these instruments; that to induce them to do so they had been persuaded, overpowered, and unduly influenced by the constant and everlasting importunities of the defendant and his said attorney, and the false representations that the value of the land did not exceed $6,000, and was incumbered by debts and mortgages over and above its value, although in truth the land, owing to the rich zinc mines thereon, was worth not less than $200,000, which fact was concealed from plaintiffs; that thereafter they kept

Mrs. Unkle in Washington, concealed from her husband and her attorneys. The prayer of the supplemental complaint is that the original deed of plaintiffs to the defendant Mary Wills be canceled, that the re-execution thereof on June 26, 1916, and the stipulation for dismissal of the then pending suit be declared null and void and of no effect, and all proper relief.

The suit was instituted by plaintiffs as poor persons, although their attorney, Ewert, had procured from them a contract for one-third of the property and also a lease on Mrs. Unkle's share of the land on very favorable terms, contingent on a recovery. Shortly after the deed had been recorded, Mr. Ewert, who before then had never heard of or known the plaintiffs, nor had they heard of him before then, wrote to them how valuable the land was, and offering to act as their attorney to recover it. Shortly thereafter he went to Washington, and sent for them to meet him at the New Willard Hotel, where they entered into the contract with him to act as their attorney. He then prepared the original complaint, in which it was alleged that the value of the land was from $50,000 to $100,000. The complaint having been read over to the plaintiffs, they verified it.

The answer of the defendants to the original and supplemental complaints denies that the defendants Fish and Swarts, when they obtained the deed of conveyance from the plaintiffs made false representations as to the value of Mrs. Unkle's interest or the value of the lands, or that they threatened her with a criminal prosecution on account of her marriage to Mr. Unkle, while she was the undivorced wife of Leander J. Fish, unless she executed the deed to her interest in the estate of the said Leander J. Fish. They deny that at the time the value of the land was from $50,000 to $100,000; deny that prior to that day lead and zinc had been discovered upon said lands, or that it had any value other than for agricultural purposes, although some lead and zinc had been discovered on some lands in the vicinity. They deny all charges of false and fraudulent representations and threats of criminal prosecution.

In response to the charges of the supplemental complaint, they allege that the sole object of going to the home of the plaintiffs on June 20, 1916, was for the purpose of effecting a compromise and settlement of the then pending suit. They deny that the defendant Fish represented the value of the lands to be $6,000, or was completely covered by debts, or that there was little or no equity in the land over and above the indebtedness; deny that there were continual importunities to execute the deed and execute a stipulation to dismiss the suit, or that they failed to inform her that the cause had been reopened before the Secretary of the Interior; deny that Mrs. Unkle was greatly weakened mentally and physically at the time. They deny that Fish or his attorney, by threats and undue influence took plaintiffs, while in a weakened mental and physical condition, to a hotel in Washington, and there overcame their weakened will and induced them to execute the instruments attacked. They admit that plaintiffs came to Washington, stopped at the Hotel Vendome, a reputable public hostelry, but that they came there voluntarily, for the purpose of settling the lawsuit, and that, after

Mr. Unkle's return to his home, Mrs. Unkle remained a few days in the city with the defendant Fish and his wife, at her own request; then deny categorically all charges of fraud, false representations, undue influence, and threats, and that plaintiffs did not know the value of the land or their legal rights. They charge that the plaintiffs knew at that time the value of the land, and that it contained valuable lead and zinc mines and agreed to the compromise and settlement with full knowledge thereof and her rights; that they carefully read over said instruments before executing them, and had them read over to them again by the notary, who took their acknowledgments to these instruments; that they agreed to make the compromise for the consideration of $1,000 in money and a deed to a lot in Ottawa county, Okl.; that long before that time plaintiffs knew, as they had been fully advised by their attorney, the nature, character, and known prospective value of the land, and they made the compromise with full knowledge of all the facts of Mrs. Unkle's rights.

The cause was heard orally in open court except the testimony of Mrs. Unkle, which was taken in Washington, D. C., by an examiner appointed by the court, and some testimony, affecting the moral character of Mrs. Unkle, which was properly held inadmissible by the trial court, and will therefore not be considered. The court made special findings of fact and a general finding for the defendants on July 15, 1920. On September 30, 1920, attorneys for the plaintiffs filed an application to amend the findings of fact and conclusions of law. Some of them were by the court sustained.

There was also a motion by plaintiffs to exclude some of the evidence introduced, which was sustained, except, it is claimed by counsel for plaintiffs in the assignment of errors, that the court refused to exclude the testimony of Mrs. Unkle at an examination had before the Commissioner of Indian Affairs. This is set forth in the ninth assignment of error. In this counsel are mistaken, as the court excluded it, as will be shown later. They also complain that the court admitted in evidence that the defendant Fish offered Mrs. Unkle a deed to the Oklahoma house, and a note from him to her asking what to do with this deed. The court certified that "the foregoing embraces all the objections of plaintiffs as to evidence which were properly saved, and this certificate of the ruling of the court on the objections to the evidence is hereby filed to become a part of the record." It shows that the evidence before the Commissioner of Indian Affairs was excluded. This certificate was filed on January 25, 1921, although the decree in favor of the defendants had been entered on October 30, 1920.

The objection to striking out the testimony of Mrs. Unkle before the Commissioner of Indian Affairs, was sustained by the court, except as stated by the court, "wherever her statements before the Commissioner are proved by witnesses, the same are admitted for what they are worth, she being a party to the suit"; but the exhibit, which purports to set out certain evidence, was stricken from the record, the court saying: "All evidence relating to said exhibit is stricken from the record." Plaintiffs certainly cannot complain of this ruling. As the court stated in its finding:

281 F.—3

"The deed executed by the plaintiffs to the defendant Mary Wills, administratrix of the estate of Leander J. Fish, deceased, trustee for Joe P. Fish on or about February 8, 1915, is void for want of consideration and the manner in which it was secured"

—from which finding the defendants did not appeal, that deed, except as re-executed by reacknowledging it on June 26, 1916, when the compromise was made, need not be considered, leaving for consideration only the validity of the alleged settlement and compromise of June 26, 1916.

There are 44 assignments of error, many of them repetitions; others merely general, such as are usually made in motions for new trials in courts of the states, in which motions for new trials are prerequisites to appeals; others refer to requests of plaintiff, which were by the court sustained. Some of the assignments are to the admission of evidence, without setting out the evidence alleged to have been erroneously admitted, as required by rule 11 of this court (188 Fed. ix, 109 C. C. A. ix) but all which are not frivolous have been fully considered.

[1-4] It is assigned as error, and was earnestly insisted on in the argument of counsel, that the court failed to rule on objections to evidence during the trial, but only ruled on them after the final decree had been entered. The refusal of the court to pass on these objections during the trial, or at any time, is not subject to review on appeal in an equity court, for several reasons. It is well settled that appeals in equity are heard de novo and disposed of finally, without remanding the cause for further trial, except in some exceptional causes, which do not apply in this cause. Harrison v. Clarke, 182 Fed. 765, 767, 105 C. C. A. 197. If the chancellor erred in the admission of evidence objected to, the appellate court will disregard such evidence, and, unless the decree can be sustained on the competent evidence, it will be reversed. Mammoth Mining Co. v. Salt Lake Machine Co., 151 U. S. 447, 451, 14 Sup. Ct. 384, 38 L. Ed. 229; Migeon v. Montana Central Ry. Co., 77 Fed. 249, 23 C. C. A. 156; Engelstad v. Dufresne, 116 Fed. 582, 589, 54 C. C. A. 38; 4 C. J. 660; Equity Rule 46 (198 Fed. xxxi, 115 C. C. A. xxxi). It frequently happens that the chancellor is not ready to pass on the objections during the hearing, but in reaching his final conclusions will disregard all incompetent evidence. The presumption of the appellate court is that he has done so.

[5] It is equally well settled that, even if objections to evidence are sustained in equity cases, it is the duty of the court to have them answered and included in the record, so that, if the appellate court finds that the chancellor erred in his rulings, the cause need not be remanded to have the requested testimony retaken. The leading case on that question is Blease v. Garlington, 92 U. S. 1, 7, 23 L. Ed. 521, followed by this court in Dowagiac Mfg. Co. v. Lochren, 143 Fed. 211, 74 C. C. A. 341, 6 Ann. Cas. 573, and Shine v. Fox Bros. Mfg. Co., 156 Fed. 357, 86 C. C. A. 311. As all the evidence is in the record before us, and the hearing is de novo, we shall only consider that evidence which in our opinion, is competent, as we must presume the learned trial judge did.

[6] The twenty-seventh assignment is that the court erred in its finding that Mrs. Unkle is a white woman. The undisputed evidence establishes that fact. It was clearly admissible, as plaintiff contended that the deed and stipulations of compromise were void for the reason that they had not been approved by the Secretary of Interior. Mrs. Unkle being a white woman, this contention is without merit. Levindale Lead Co. v. Coleman, 241 U. S. 432, 437, 36 Sup. Ct. 644, 60 L. Ed. 1080, Mixon v. Littleton, 265 Fed. 603, 605, decided by this court. Although in neither of these cases were Quapaw Indian allotments involved, the reasoning applies to all Indian allotments. As said in Levindale Lead Co. v. Coleman:

"The provisions of the Allotment Act must be construed in the light of the policy they were obviously intended to execute. It was a policy relating to the welfare of Indians—wards of the United States. The establishment of restrictions against alienation 'evinced the continuance, to this extent, at least, of the guardianship which the United States had exercised from the beginning.' Heckman v. United States, 224 U. S. 413, 436; United States v. Kagama, 118 U. S. 375, 384; United States v. Rickert, 188 U. S. 432, 437, 438; Tiger v. Western Investment Co., 221 U. S. 286, 316; Williams v. Johnson, 239 U. S. 414, 420. This policy did not embrace white men—persons not of Indian blood, who were not as Indians under national protection, although they might inherit lands from Indians, and, with respect to such persons, it would require clear language to show an intent to impose restrictions."

The assignments (tenth and twelfth) that the court admitted in evidence the testimony of a number of witnesses, who testified to Mrs. Unkle's immoral conduct after she had deserted her husband Fish, is in the face of the record, which shows that the court excluded it. This also applies to the testimony relating to Mrs. Unkle's bigamous marriage.

[7] The eleventh assignment is that the court erred "in directing the parties three months after the entry of the final decree to file objections to alleged incompetent evidence." This order was made during the term at which the decree was entered, and, as the court had full control of its decree during that term, it could set it aside, amend or modify it. Aside from this, this order could in no wise prejudice plaintiffs, especially as some of their objections were sustained by the court.

[8] The thirteenth assignment is to the refusal of the court to permit Mr. Unkle to testify to a conversation between himself and wife in their private bedchamber. It requires no citation of authorities that the court committed no error in this ruling. The main issue is the finding of the chancellor for the defendants.

[9] There are certain well-established rules of law applicable to actions of this nature, which are not only pertinent, but controlling on some of the issues in this cause. To justify a court of equity to set aside a deed of conveyance or a compromise between litigants, it is not sufficient for the plaintiff to establish the charges of fraud by a mere preponderance of the evidence; but the evidence must be full, clear, unequivocal, and convincing. Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; United States v. Iron Silver Mining Co., 128 U. S. 673, 676, 9 Sup. Ct. 195, 32 L. Ed. 571; Lalone

v. United States, 164 U. S. 255, 257, 17 Sup. Ct. 74, 41 L. Ed. 425; Campbell v. Northwest Eckington Co., 229 U. S. 561, 584, 33 Sup. Ct. 796, 57 L. Ed. 1330; United States v. Delatour, (C. C. A.) 275 Fed. 137. And this applies with great force to compromises of conflicting family claims. Mastin v. Noble, 157 Fed. 506, 508, 85 C. C. A. 98; Wilson v. Sands, 231 Fed. 921, 923, 146 C. C. A. 117; Burnes v. Burnes, 137 Fed. 781, 801, 70 C. C. A. 357; Bunel v. O'Day (C. C.) 125 Fed. 303, 318. In the Burnes Case Judge Sanborn, speaking for this court, said:

"For obvious reasons of public policy, compromises of conflicting claims by family settlements are encouraged by the courts, and they may not be avoided or disregarded for mere inadequacy of consideration, or except upon clear and convincing proof of grave fraud or mistake"—citing numerous authorities to sustain it.

[10] Another equally well-established rule of law is that, while the findings of the chancellor in an equity case on conflicting evidence, have not the conclusive effect given to the verdict of a jury or of the trial judge when a jury has been waived, they are entitled to high consideration, and unless clearly against the weight of the evidence, or induced by an erroneous view of the law, they will not be disturbed by the appellate court, and this applies with greater force when practically all the testimony was taken in open court, affording the trial judge the opportunity to note the demeanor of the witnesses for the purpose of determining their credibility, which the appellate court, hearing the case on a printed record, has not. United States v. United Shoe Machinery Co., 247 U. S. 32; 38 Sup. Ct. 473, 62 L. Ed. 968; Butte & Superior Co. v. Clark-Montana Co., 249 U. S. 12, 30, 39 Sup. Ct. 231, 63 L. Ed. 447; Fay v. Hill, 249 Fed. 415, 418, 161 C. C. A. 389; Ridge v. Healy, 251 Fed. 798, 814, 164 C. C. A. 32; Hamlin v. Grogan, 257 Fed. 59, 60, 168 C. C. A. 271; United States v. Delatour, supra.

The first three assignments of error complain of certain findings and conclusions of law which go to the merit of the entire cause, and therefore will be disposed of later in the determination of the appeal on the merits. The fourth is a general assignment, that the court erred in entering a decree for defendants, and the fifth, to the part of the decree requiring the clerk to deliver to Mrs. Unkle, the deed to the Commerce house and land, and require no consideration.

Assignments 6, 7, and 8 complain that the court failed to rule upon objections made by plaintiffs to the admissibility of evidence offered by defendants. None of these assignments set out what that evidence was, as required by rule 11 of this court, but are general. Assignment 6 is:

"The court erred in not ruling upon the objections made by the plaintiffs to the introduction of incompetent, irrelevant, and immaterial testimony during the course of the trial until after the making and filing of his so-called 'findings of fact and conclusions of law' on the 19th day of July, 1920, and before entering and filing the final decree in said case."

The seventh and eighth assignments are practically the same, it is therefore only necessary to copy one of them:

"(7) The court erred in not ruling upon the admissibility of testimony offered by the defendants and objected to by the plaintiffs in the course of the trial until after his final decree and judgment in said case was filed on October 30, 1920."

The tenth and twelfth assignments complained of the admission in evidence of the testimony of a number of witnesses, whose testimony related to the plaintiff's moral conduct. The record shows that these objections were by the court sustained.

[11] The fourteenth assignment is a finding of fact not warranted by competent evidence and refers to Mrs. Unkle's bigamous marriage, but on the hearing to amend the findings of fact this was excluded by the court. This cured the error.

The other assignments, except the twenty-seventh, with few exceptions, are too general to require consideration. They are to the effect that the court erred in its findings, conclusions of law, and refusal to amend them at plaintiffs' request.

[12] There are some facts which have been established beyond controversy: That Mrs. Unkle was the widow of Leander J. Fish, at the time of his death, although she had remarried, under the belief, based on statements of the deceased Leander, that he had obtained a divorce from her; that under the laws of the state of Oklahoma she is entitled as his widow to one-half of the lands in controversy. It was also established beyond question that, at the time the compromise was made, the lands and plaintiff's half interest in them as the widow of Leander J. Fish, after payment of the debts of the deceased and the liens on the land, were of great value, much greater than the amount paid her in the compromise; that that fact was well known to the defendant Joe P. Fish, as well as the plaintiffs; that the debts of the estate of Leander amounted to about $6,000 of which $3,100, which, with the accumulated interest, amount to about $4,000, was secured by a mortgage on the land; that the plaintiffs had been informed of its value by their attorney, Ewert, when he first solicited them by letter to employ him, again when he met them later in Washington and was employed by them to institute this action, and when he read the complaint to them before it was filed. Nor does the evidence leave any doubt that Mrs. Unkle was at the time in poor health and at all times a woman of weak will power; but she knew, and so did her husband, although he was illiterate, that her interests in the estate were of much greater value than the amount paid her in the compromise. There was substantial evidence that, in the presence of his wife, Mr. Unkle at first demanded $10,000 to compromise, which Fish declined to pay, and later on Mrs. Unkle insisted on $2,000. When told by Fish that he could not pay that sum, but would give her in addition to the $1,000, the house and lot in Commerce, and $100 to Mr. Unkle, they finally agreed to it, and, upon the execution of the compromise, these sums were paid to them, and later a deed to the house and lot in Commerce tendered to her.

The testimony of Mrs. Unkle, taken by depositions in Washington, was practically all of it elicited by leading questions propounded by Mr. Ewert, her attorney, against the objections of counsel for defendants.

The examiner failed to rule on any of these objections, but left it to Mr. Ewert to pass on them. A few extracts from her deposition will illustrate the manner in which it was taken:

"Q. Why did you go home?
"Mr. Cravens: Defendants renew the objection.
"Mr. Ewert: Answer the question. A. Well, he was drunk all the time.
"Q. On the occasion of the second visit, what else, if anything, was said by them, relative to the value of the land in question?
"Mr. Cravens: Defendants object to that as being leading.
"Mr. Ewert: Go on; answer the question.
"Q. What else did they say about the land?
"Mr. Cravens: We object as being suggestive.
"Mr. Ewert: Go on; answer the question.
"Q. State what was said relative to your marriage to Mr. Unkle.
"Mr. Cravens: We renew our objections to that question.
"Mr. Ewert: Answer the question now.
"Q. Did he say you had better sign the deed?
"Mr. Cravens: We object to that as being suggestive.
"Mr. Ewert: Answer the question.
"Q. What did he say?
"Mr. Cravens: We object to these questions as being leading and suggestive.
"Mr. Ewert: Answer the question.
"Q. Did you, or not, know what you were doing?
"Mr. Cravens: We object to that as being leading and suggestive, and as calling for a conclusion of the witness.
"Mr. Ewert: Answer the question. A. No."

These are only a few of the rulings made by Mr. Ewert, the examiner failing to rule on any of the numerous objections made by counsel for defendants. A few of the many leading questions asked Mrs. Unkle by Mr. Ewert, against the objections of counsel for defendants, will show how suggestive they were. These questions were always asked, when she was unable to answer the question properly propounded:

"Q. State what Mr. Swarts asked you. (No answer; whereupon the question:) "Did he ask you whether you were married to Mr. Unkle? A. Yes.
"Q. What else did he say? (No response.)
"Q. Did he ask you whether you had a marriage certificate to Mr. Unkle? A. Yes, sir; he asked me if I was married, and did I have a certificate, and to go and get it and show it to him.
"Q. What did they say about your marriage to Mr. Unkle? (No response.) Q. Did they make threats to have you arrested for bigamy, if you did. not sign the deed? A. Yes, sir.
"Q. Did they ask you to make a new deed? A. Yes, sir; I told them I wouldn't sign any papers.
"Q. Did you believe the statements that the land was incumbered, and that it had been deeded away by Fish during his lifetime to his nephew? A. Yes, sir.
"Q. Did you, in reliance upon these statements so made by Mr. Fish and Mr. Cravens, reacknowledge these papers and sign the other two? A. Yes, sir.
"Q. Did they tell you that there had been a very valuable mine discovered on this land? A. No, sir.
"Q. If they had told you the land was valuable, would you have signed these papers? A. No, sir.
"Q. Did you know what you were doing? A. No, sir.
"Q. Did Mr. Lewis tell you you had been defrauded again? A. Yes, sir; he told me.
"Q. Right there in the Indian Office, after you had talked with your lawyer, Mr. Lewis, did you or did you not rescind the contract? A. Yes, sir.

"Q. State whether or not you are willing to turn back the $1,000 and interest that they have paid you. A. Yes, sir."

Many other leading questions of a similar nature were asked as to the first visit, when the deed was executed, which need not be set out here, in view of the fact that that deed was held to have been improperly obtained. The examination relating to the compromise settlement was conducted in the same manner, as will be seen from quoting a few questions:

"Q. What did Joe say? A. Well, he just said he came out to see me.
"Q. What else did he say? A. I can't think what he said.
"Q. Did he say you had better sign the papers? A. Yes, sir."

In view of these facts, the testimony of Mrs. Unkle must be considered, if at all, with great caution. On July 7, 1916, Mrs. Unkle testified, at a hearing before the acting Commissioner of Indian Affairs, who was hearing the application of defendants to approve the deed and compromise; the parties then being under the impression that an approval by the Commissioner of Indian Affairs was necessary. On cross-examination she testified that at that examination she had stated that she understood the compromise papers when she signed them on June 26, 1916, and that Fish had told her the land was worth $8,000; that she might have testified that if the house in Commerce was put in, she would sign the compromise agreement, although to most of the questions she answered that "she couldn't remember." The certified copy of the testimony taken before the Commissioner shows that she was represented by counsel, one of the attorneys in this cause, who conducted her direct examination and told her:

"I want you to understand that I am your counsel and looking after your interests, and you should have no hesitation in answering the question."

[13] In our opinion, admissions against a party's interest are always admissible, especially when represented by counsel, who conducted the examination for her. For this reason we shall consider that testimony but so far only as it contains admissions against her interest. She there stated that she read the compromise papers when she signed them and understood what they meant; that the money was paid to her, deposited by her in the bank where it then was; that she was told by Fish that the land was worth only $8,000, but did not believe it, as she knew better; that she signed the papers on Joe's (referring to the defendant Fish) account, evidently by reason of being her stepson, as stated by the trial judge. As to the charge that she was kidnapped and kept from her husband, she testified:

"I wanted to stay in Washington, because it was so awful hard at home, and my husband is not treating me right."

She further testified:

"I had been cautioned by Mr. Ewert not to sign any papers. * * * I became acquainted with Mr. Ewert by receiving a letter from him, asking me to employ him as counsel to get this land for me, never having known of him before. I met him in Washington and made a contract with him to act as my counsel, but I don't know how much he is to get. He informed me of the value of the land, saying it was full of zinc. I knew he had brought suit for me. I agreed with Joe, before going to Washington, to accept $1,000

and the house and lot to settle the controversy. I understood that it was to settle my suit with Joe. Joe's wife said the land wasn't worth over $2,000, but I knew better than that. When the papers were given to me, I said I wouldn't sign them unless I got $2,000; but I then said, if the house and lot was put in, I would sign the papers for $1,000, and then it was put in and I agreed to sign the papers. Mr. Lee, the notary, read the papers over to me, and then I signed them. I understood them. I stayed a few days after that in Washington, with Joe and his wife, at their boarding house; Mr. Unkle agreeing for me to stay. I didn't want to go home to my husband, as he doesn't treat me right."

Mr. Unkle also testified that the compromise papers were read to him, and that his wife read them before executing them. There was substantial testimony on the part of the defendants that this compromise was understandingly made by the plaintiffs, that both plaintiffs knew the value of the property, that Mrs. Unkle read the compromise agreements, and then again had them read to her and her husband by the notary, before executing them, and did so unhesitatingly. There is no evidence whatever that at the time the compromise was made, any threats of criminal prosecutions were made to Mrs. Unkle.

A careful, painstaking examination of the evidence satisfies that, applying the rules of law hereinbefore stated, the evidence warrants the finding of the learned trial judge that there was no undue influence or threats used towards complainants to induce them to sign the compromise instrument, and that the settlement was a valid compromise of the litigation. We fail to find any obvious error in the application of the law prejudicial to appellants, nor any mistake in the consideration of the evidence.

The decree is accordingly affirmed.

SANBORN, Circuit Judge (dissenting). I concur in the statement of the rules of law made by the majority in the foregoing opinion, but am unable to agree to the conclusion they reach, because the evidence has convinced my mind that Mrs. Unkle, an ignorant woman of weak will, without experience in business affairs, was, by the threats, persistent influence and importunities, and by the misrepresentations as to the value of her property, the character of her attorney, and other influential matters, inequitably coerced to part with and defrauded out of her valuable property.

On Motion to Amend Opinion and Decree.

Paul A. Ewert, of Joplin, Mo., for appellants.
O. L. Cravens, of Neosho, Mo., for appellees.

PER CURIAM. Counsel for appellants have filed a motion to amend the opinion and decree of the court in this cause. He seems to be under the impression that the finding of the trial judge, which was affirmed by this court, is that the deed originally executed by the appellees was absolutely void.

[14] It is true that the learned trial judge in his finding states that the deed was void for want of consideration and the manner in which it was secured, and, as no appeal was taken by the defendants, we did not deem it necessary to pass upon that question. While the lan-

guage used by the trial judge was that the deed was void, what was actually meant by him was that it was voidable. The word "void" is often used by legislators, courts, lawyers, and laymen, when its true meaning is "voidable." In Weeks v. Bridgeman, 159 U. S. 541, 547, 16 Sup. Ct. 72, 74 (40 L. Ed. 253), it was said:

"It is rarely that things are wholly void, and without force and effect as to all persons and for all purposes, and incapable of being made otherwise. Things are voidable, which are valid and effectual until they are voided by some act; while things are often said to be void which are without validity until confirmed."

The same rule was recognized by this court in Ramsay v. Crevlin, 254 Fed. 813, 817, 166 C. C. A. 259, and Walker v. Arkansas National Bank, 256 Fed. 1, 3, 167 C. C. A. 273.

[15] The deed of the plaintiffs was clearly good as against every one, including the grantors, until set aside by a decree of a court of competent jurisdiction. The plaintiffs filed their original bill in this cause to set that deed aside, but shortly thereafter, for a valuable consideration, and with full knowledge of all the facts, as was found by the trial judge and affirmed by us, ratified the deed and directed the dismissal of the suit. The effect of this act of theirs made the deed as effective from the date of its execution and delivery as if no action to set it aside had ever been instituted. The rights of the defendant under the deed are those acquired when the deed was delivered.