**JOHNSON et al. v. UNITED STATES et al.**
(two cases).
**Nos. 754, 755.**

Circuit Court of Appeals, Tenth Circuit.
April 10, 1933.

No. 754:

H. A. Ledbetter, J. E. Williams, and W. D. Potter, all of Ardmore, Okl., and Robert A. Hefner, of Oklahoma City, Okl. (H. E. Ledbetter and E. H. Williams, both of Ardmore, Okl., on the brief), for appellants.

W. F. Rampendahl, U. S. Atty., of Muskogee, Okl., for appellees.

No. 755:

H. A. Ledbetter, of Ardmore, Okl. (H. E. Ledbetter. of Ardmore, Okl., on the brief), for appellants.

W. F. Rampendahl, U. S. Atty., of Muskogee, Okl., for appellees.

Before LEWIS, PHILLIPS, and MC-DERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

These appeals involve the construction to be given to the second proviso to section 9 of the Act of May 27, 1908 (35 Stat. 312). That act provided for the allotment of the lands of the Five Civilized Tribes, and placed certain restrictions on the alienation of some of the allotments. No allotments were made to the issue of tribal members born after March 4, 1906, provision for their support being made in section 9. That section first enacts that the death of an allottee shall operate to remove all restrictions upon alienation of the allottee's land, subject however to this proviso:

"Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-sixth, nineteen hundred and thirty-one; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions."

Ella Williams, a ¾ blood Chickasaw, was allotted the land here involved as a homestead. In 1913, she executed an oil and gas lease on the homestead with the approval of the Secretary of the Interior. She died in 1916 intestate, leaving as her heirs, her husband, George Williams, a white man, and six children, all of ⅜ Indian blood, two of them by a former husband named Lester. One of the children only, Cecil, was born after March 4, 1906. After the death of the allottee, her husband and her five children other than Cecil, executed numerous instruments purporting to convey their interests in the homestead, or the royalty under the lease. The assignments of the minor children, born before March 4, 1906, were by their legal guardian, duly ordered and confirmed by the county court. These conveyances or assignments were all made during the lifetime of Cecil and long before April 26, 1931. The instruments contained no reservation of the rights of Cecil, and were not approved by the Secretary of the Interior.

These suits involve the validity of these transfers by the husband and the five children. The only question is whether they have any alienable interest in the homestead during the lifetime of Cecil, and prior to April 26, 1931. No attack is made on the validity of the proceedings in the county court, and no challenge made to the capacity of the white husband or the adult children to convey what is theirs without the approval of the Secretary of the Interior. One of the suits is by the assignee of the royalty interest of the minor children to quiet his title; the other by the United States to cancel all instruments executed prior to April 26, 1931, during Cecil's life, purporting to transfer any interest in this homestead allotment, or its mineral reserve.

The issue is further narrowed by the pleadings of the adverse claimants. Each

expressly acknowledges the right of Cecil to the exclusive enjoyment of the homestead, and to the use of the royalties, until April 26, 1931, as determined in Parker v. Riley, 250 U. S. 66, 39 S. Ct. 405, 63 L. Ed. 847. Each disclaims any right to possession or enjoyment until after that date, which had however passed when the decree below was entered. The trial court held that the instruments executed prior to April 26, 1931, conveyed no interest in the homestead or royalties; a decree was entered in favor of the United States in both cases, from which these appeals are taken. Pending the appeal the cause was dismissed as to Madgelee Ledbetter, administratrix of the estate of Wesley Lester, and guardian of his minor heirs.

The question presented is a close and important one. For the government, it is argued that the power of Congress over Indians and their allotments is plenary; that the statute is clear and unambiguous, and leaves no room for construction. The statute says that the homestead of a tribal member of half or more Indian blood, who dies leaving issue born since March 4, 1906— which is the case here—"shall remain inalienable" for the use and support of such issue until April 26, 1931, unless the restriction is removed by the Secretary. The Secretary did not remove the restriction; the conveyances here involved were made prior to the date fixed and during the lifetime of Cecil. The argument is closely knit, and if we go no further than the wording of the statute, it is difficult to answer. As a reason for this action of Congress, it is suggested that while the restriction is imposed for the benefit of the child born after March 4, 1906, and not for the white husband or members of less than the half blood (Levindale Lead & Zinc Mining Co. v. Coleman, 241 U. S. 432, 36 S. Ct. 644, 60 L. Ed. 1080; section 1, Act of May 27, 1908), that in order more adequately to protect the ward of the government, it was appropriate that Congress should prohibit barter and sale of the future interest of the other heirs; that the enjoyment of the ward would be less likely to be disturbed or contested, if the future interest did not pass from the hands of her relations to those of strangers.

Appellants take a broader view of the statute; they invoke the settled rule that the object of statutory construction is to ascertain the true intent of Congress; that the background and the purpose of the enactment should always be looked into, and a construction given that will effect its purpose if it can be done without violence to the words

employed, and in extreme cases, even then. They point out that to construe the restriction as applicable only to the estate set apart for the "use and support" of the ward, does no violence to the language of the statute; in fact, that such construction is necessary if any meaning is to be given the words "use and support," which another canon of construction requires. It is also urged that the construction urged by the government either puts a restriction on white persons conveying interests owned by them, contrary to the settled policy of the government in Indian matters, or leaves the title to the homestead in suspense, contrary to the settled law of real property.

If the question were an open one, we would agree with the contention of appellants. The word "inalienable" contained in the proviso is not adamantine. The Osage statute (34 Stat. 539) provides that the homestead of an Osage "shall be inalienable" until otherwise provided by act of Congress. In Levindale Lead & Zinc Mining Co. v. Coleman, 241 U. S. 432, 36 S. Ct. 644, 646, 60 L. Ed. 1080, the facts were that a white man had inherited an interest in an Osage homestead, and the argument was made there, as here, that he could not alienate his interest because the restriction ran with the land. The Supreme Court held that the restriction should be construed as running "only according to the intendment of the statute." It was held that the restriction should be construed in light of the general policy of the United States in its dealing with Indians, a policy which did not include persons of non-Indian blood within its scope. The court upheld a conveyance by the non-Indian which was not approved by the Secretary of the Interior, saying in part:

"This policy did not embrace white men, —persons not of Indian blood,—who were not as Indians under national protection, although they might inherit lands from Indians; and, with respect to such persons, it would require clear language to show an intent to impose restrictions. * * * We find no indication of an intent that they should apply to lands, or an interest in lands, which had come lawfully into the ownership of white men who were nonmembers of the tribe." Pages 437, 438 of 241 U. S., 36 S. Ct. 644, 646.

Forbidden violence to the word "inalienable" is not therefore done by excluding from the restriction imposed by the statute, the white husband of the allottee, or her children of less than half-blood, who are freed from

all restrictions by Section 1 of the Act of May 27, 1908. In fact, to impose a restriction upon whites and unrestricted Indians is opposed to the general policy spoken of in the Levindale Case. Furthermore, the construction of appellants fits more snugly into the general framework of the statute. The purpose of the statute was to release restrictions from much of the empire occupied by the Five Civilized Tribes, and put it on the tax rolls. All lands, including homesteads, of those having less than half Indian blood were released by Section 1. Section 9 released otherwise restricted lands upon death of the allottee, with two reservations. The purpose of the reservation in question is clear as sunlight; it was to give to the child without an allotment of its own, a special estate in the homestead during its life until April 26, 1931. The child could not alienate that estate without the consent of the Secretary; others could not encroach upon its enjoyment. We see no reason to think Congress intended to deny to a white or unrestricted Indian heir the right to sell what he owned; nor do we see any purpose to be subserved by such restriction. Neither the white heir, nor his assignee, could disturb the child's special estate, and we see no reason to suppose that an assignee would be more apt to attempt to encroach upon the special estate, than would his assignor. The white or unrestricted Indian heir might not find a ready market for his future interest in the land, and might sell it at a sacrifice; but the general purpose of the section is to protect the child born after 1906, and not the other heirs.

But the question is no longer an open one. It was first presented to the Supreme Court of Oklahoma in 1924, in the case of Grisso v. Milsey, 104 Okl. 178, 230 P. 883, 887. The facts in that case may be distinguishable, but the court put its decision on broad grounds. It held that:

"In the absence of a removal of restrictions by the Secretary of the Interior, the widow and other children of the allottee had no more interest which they could convey in the homestead portion of his allotment after his death than they had before his death, so long as Rosetta survived. Before his death they had no interest which was subject to barter, and neither had they afterwards, until the death of Rosetta, unless the restrictions imposed had been removed by the Secretary of the Interior; and it is not contended that this had been done."

This broad language has been followed in three later cases, and conveyances by other heirs under a variety of circumstances, made during the existence of the special estate, have been held to be void and cancelled. Kimbro v. Harper, 113 Okl. 46, 238 P. 840; Take v. Miller, 139 Okl. 115, 281 P. 576; Gage v. Harlin, 122 Okl. 169, 250 P. 82. In the latter two cases certiorari was denied. 281 U. S. 729, 50 S. Ct. 245, 74 L. Ed. 1145; 275 U. S. 484, 48 S. Ct. 18, 72 L. Ed. 386. These decisions, construing a federal statute, are not binding upon the federal courts. Since they did turn on the construction of a federal statute, the denial of certiorari has some added significance. But they are persuasive authority, not only because they are pat, but because they declare a rule of law as to real estate titles in Oklahoma. They will doubtless be followed by the Oklahoma courts in all cases that arise, unless the Supreme Court of the United States decides otherwise. As far as possible, rules governing titles to real estate, and all business transactions, ought to be uniform in the same territorial jurisdiction. A man's rights ought not to depend upon whether $3,000 is involved. Cities Service Oil Co. v. Roberts (C. C. A. 10) 62 F.(2d) 579.

The question came before the United States District Court for the Eastern District of Oklahoma, where much of the land affected by the statute is situate, in United States v. Martin, 45 F.(2d) 836. Judge Williams, who has had wide experience in these cases, followed the Oklahoma decisions. This court, in Holmes v. United States, 53 F.(2d) 960, held the same way. That case is not distinguishable; while the heirs there conveying were of Indian blood, their conveyance was approved by the county court as provided by the statute. The conveyance there was expressly made subject to the special estate of issue born since March 4, 1906 and it was stipulated that the grantee had not interfered with that special estate. The conveyance was nevertheless set aside.

It thus appears that appellees' construction has become a settled rule of real property in both the state and federal courts. Rules of property ought to be adhered to. If titles are now to be unsettled, it ought to be accomplished by an authoritative decision of the Supreme Court of the United States which will determine the question, once for all, and for the courts of both the state and the nation.

The other contention of appellants is without merit. The suit by the United States is properly brought to enforce restrictions

678

imposed by Congress for the benefit of its ward,—here the child born after March 4, 1906. Heckman v. United States, 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820; United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844.

The decrees appealed from are, therefore, Affirmed.