## FREUND ET AL. *v.* UNITED STATES.

## UNITED STATES *v.* FREUND ET AL.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 29, 37.　Argued October 5, 6, 1922.—Decided November 13, 1922.

1. Broad provisions in a government contract, authorizing the Government to change the obligations imposed on the other party should be interpreted, not as permitting government officials to remould the contract at will, but as confined to what was fairly and reasonably within the contemplation of the parties when the contract was made. P. 62.

2. Where a contractor undertook a circuit mail-carriage service from and back to a city post-office site via scheduled stations, with stops en route to collect mail from letter carriers, to be paid for at so much for every mile traveled, a stipulation in the contract authorizing the Postmaster General to establish service to and from like offices, stations, etc., to those named in the schedules, to be paid for at the contract rate per mile of travel, did not authorize substitution of a much heavier service, in transporting all mail between railroad stations and another post-office site, involving increased equipment and expense, and paid for at the same mileage rate but without counting trips on which no mail was carried. P. 64.

3. Contractors who were encouraged by agents of the Post Office Department to enter into a mail-carriage contract and give a heavy bond, without notice of the Department's purpose to substitute a more onerous service under color of the contract but not within its terms, and who performed the new service, under protest, rather than incur the risk to themselves and their bondsmen of throwing up the contract, *held*, not to have acquiesced in the change. P. 68.

4. A mail-carriage contractor who, under duress of the Post Office Department, performs service not called for by his contract, is entitled to recover, in the Court of Claims, the reasonable value of such service, including a fair profit. P. 69.

56 Ct. Clms. 15, reversed.

APPEALS from a judgment allowing, in part, a claim for service in carrying the mails.

*Mr. William R. Harr,* with whom *Mr. Charles H. Bates* was on the brief, for Freund et al.

*Mr. A. A. Wheat,* with whom *Mr. Solicitor General Beck* and *Mr. William C. Herron* were on the brief, for the United States.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a suit against the Government to recover $34,012.90 as the remainder unpaid of an amount earned by 16 months' service in carrying the mails by wagons in the City of St. Louis. After official advertisement, a bid was made by appellants April 4, 1911, and accepted April 20, 1911, for service on a particular route described by a schedule, for a certain annual gross sum, which, being divided by the miles to be covered, made a certain rate per mile. A contract was signed May 22nd. The contract was for four years, beginning July 1, 1911. The route was for seven daily circuit trips from and back to the new St. Louis Post Office. That office was not ready for occupancy on July 1, 1911, or for 16 months thereafter, and the old Post Office, which was thirteen blocks from the new one, continued to be used. The Post Office Department, relying on certain clauses in the contract, and upon a notice given to bidders, substituted another route and ordered the contractor to begin performance on July 1st, at what the Department held to be the same rate per mile of service. The contractors protested, but, threatened with suit upon their bond, performed the service and accepted periodical payments on the new route until October 28, 1912, the date of occupying the new Post Office, when the route bid upon and contracted for was initiated and the contractors did the work under it till the term ended. The cost to the contractors of doing the work on the substitute route was $43,726.89,

and they were paid by the Government $24,289.62. Thus their loss was in round numbers $19,500 during the 16 months of the substituted route. After October 12, 1912, on the original route, the contractors made a profit of 42 per cent. on its cost in what remained of the term.

The contractors' claim was that the substitution of the new route for the one they bid on was not within the terms of the contract, but was unconscionable, and that they were entitled to recover for the work done on the new route on a *quantum meruit*. The Court of Claims held that it was not necessary to determine whether the new route was properly substituted for the old, because the contractors had acquiesced in this view by their performance, but that the Government had not, in adapting the mileage rate of the original route under the contract to the new route, done justice to the contractors in the number of miles allowed, and on this basis gave judgment for $7,346.66. From this the contractors appealed. The Government brings a cross appeal, claiming that, as the contractors accepted full pay under the contract as construed and expressed by the Department, they should recover nothing.

It is, of course, wise and necessary that government agents in binding their principal in contracts for construction or service should make provision for alterations in the plans, or changes in the service, within the four corners of the contract, and thus avoid the presentation of unreasonable claims for extras. This court has recognized that necessity and enforced various provisions to which it has given rise. But sometimes such contract provisions have been interpreted and enforced by executive officials as if they enabled those officers to remould the contract at will. The temptation of the bureau to adopt such clauses arises out of the fact that they avoid the necessity of labor, foresight and care in definitely drafting the contract, and reserve power in the bureau. This does

not make for justice; it promotes the possibility of official favoritism as between contractors, and results in enlarged expenditures, because it increases the prices which contractors, in view of the added risk, incorporate in their bids for government contracts.   These considerations, especially the first, have made this Court properly attentive to any language or phrase of these enlarging provisions which may be properly held to limit their application to what should be regarded as having been fairly and reasonably within the contemplation of the parties when the contract was entered into.   These observations are justified and illustrated by decisions of this Court in *United States* v. *Utah, Nevada & California Stage Co.,* 199 U. S. 414, and *Hunt* v. *United States,* 257 U. S. 125.

The Court of Claims, after giving the two schedules in full, sums up the contrast between them as follows:

" The service bid upon was a circuit service on seven circuits, on a mileage basis, each circuit beginning and ending at the new post office and for which the contractor was paid for every mile traveled regardless of the quantity of mail carried or whether for any part of the distance no mail was carried.   The restated service [i. e., on the new route] was a trip service for which payment was made on a mileage basis when mail was carried, but no payment was made for a return trip if mail was not carried or for distance traveled by empty vehicles in going to a point from which mail was to be moved.

" The service bid upon involved the handling of the mails for a small area and was a comparatively light service.   The restated service required the hauling of incoming and outgoing mails for the entire city and involved handling several times the weight of mail.   The service bid on required 6 automobiles.   The restated service required 18 wagons of different capacity exceeding several times in aggregate capacity that required for the bid on service.   The mileage of each wagon when carrying

mail, was allowed and paid for. The larger bulk of mail required proportionately more time in loading and unloading.

"The bid upon service, with the exception of one early trip on each of these circuits, was all to be performed within 12 hours from approximately 8 A. M. to 8 P. M. The restated service required trips during practically every hour of the twenty-four."

By a note in the advertisement, by paragraph ten in the contract, and by a further somewhat more elaborate stipulation in the contract, provision was made for changes. The last contained all that was in the others, and was as follows:

" It is hereby stipulated and agreed by the said contractors and their sureties that the Postmaster General may change the schedule, vary, increase, or decrease the trips on this route, or extend the trips to any new location of the post offices, railroad stations, steamboat landings, mail stations, or points of exchange with cable or electric cars named in the schedule for service for said route, in said advertisement, establish service to and from *like* offices, stations, landings, or points not named therein, and vary, increase, or decrease the trips thereto, and discontinue service between any of the post offices, railroad stations, steamboat landings, mail stations, or points of exchange with electric or cable cars, or between any of them: *Provided,* That for any increase or decrease in the service authorized by the Second Assistant Postmaster General, the pay of the contractors shall be increased or decreased, as the case may be, at the rate per mile of travel agreed to be paid for service under this contract, as shown by the annual rate of compensation and the annual miles of travel, based on the frequency and distances shown in the schedule of service for said route in said advertisement."

There are two limitations in this very broad provision which deserve notice. One is that the offices, stations,

landings and points, not named in the schedule, to and from which the Postmaster General was permitted to establish service, were to be *like* those named in the schedule, and the other is that the substituted service was to be such that the method of fixing pay in the original contract could be applied to it. Now it is clear to us that the substituted route did not establish a route to like stations and points. The findings give the two schedules and we reproduce them in the margin.[1] An examination

---

[1] *Route No. 445004. (Mileage basis)—Regulation screen-wagon service at St. Louis, Mo.—Mail-station service.*

| From— | By— | To— | Distance. | Number of trips daily except Sunday (306). | Number of trips on Sunday. | Total number of trips holidays (7). | Running time. |
|---|---|---|---|---|---|---|---|
| | | | *Miles.* | | | | *Min.* |
| Circuit No. 1: Post Office (new site). | Central Station (old post office). | Post office (new site) and 4 stops per trip en route to receive mail collections from letter carriers. | 2.00 | 23 | 5 | 5 | 25 |
| Circuit No. 2: Post Office (new site). | Cupples and Merchants stations. | Post office (new site) and 1 stop per trip en route to receive mail collections from letter carriers. | 2.60 | 9 | 5 | 5 | 30 |
| Circuit No. 3: Post Office (new site). | Progress and Bridge stations. | Post office (new site) and 7 stops per trip en route to receive mail collections from letter carriers. | 3.00 | 9 | 5 | 5 | 30 |
| Circuit No. 4: Post Office (new site). | Cupples and Merchants stations. | Post office (new site) and 6 stops per trip en route to receive mail collections from letter carriers. | 2.80 | 11 | 0 | 0 | 30 |
| Circuit No. 5: Post Office (new site). | Merchants and Central (old post office) stations. | Post office (new site) and 2 stops per trip en route to receive mail collections from letter carriers. | 2.80 | 11 | 0 | 0 | 30 |
| Circuit No. 6: Post Office (new site). | Bridge and Progress stations. | Post office (new site) and 2 stops per trip en route to receive mail collections from letter carriers. | 3.00 | 11 | 0 | 0 | 30 |
| Circuit No. 7: Post Office (new site). | Progress Station. | Post office (new site) and 5 stops per trip en route to receive mail collections from letter carriers. | 2.20 | 11 | 0 | 0 | 30 |

*(Footnote continued on p. 66.)*

shows that the one was a light service of circuits from the
Post Office and back again to take up collections from

*(Footnote continued from p. 65.)*

"POSTOFFICE DEPARTMENT,
"SECOND ASSISTANT POSTMASTER GENERAL,
"*Washington, June 30, 1911.*

"POSTMASTER, *St. Louis, Mo.*

"SIR: An order has been issued to-day on route No. 445004, screen-wagon service at St. Louis, Mo., restating the service from July 1, 1911, making total annual travel 57,679.60 miles and pay $18,265.61 per annum, being pro-rata of original contract price.

| From— | To— | Length of trip, miles. | No. of trips daily except Sundays and holidays (306). | No. of trips on Sunday (52). | Additional trips a week (52). |
|---|---|---|---|---|---|
| GPO | Union Depot | 1.18 | 71 / 71. Holidays (7). | 37 | 4 |
| Union Depot | GPO | 1.18 | 32 / 32. Holidays (7). | 25 | 2 |
| GPO | United Rys. of St. Louis (8th and Market) | 0.21 | 29 / 23. Holidays (7). | 6 | ...... |
| United Rys. of St. Louis (8th and Market) | GPO | 0.21 | 31 / 12. Holidays (7). | 4 | ...... |
| GPO | United Rys. of St. Louis (8th and Locust) | 0.09 | .......... |  |  |
| United Rys. of St. Louis (8th and Locust) | GPO | 0.09 | 8 / 3. Holidays (7). | 1 | ...... |
| GPO | Cupples Sta | 0.50 | 10 / 5. Holidays (7). |  |  |
| Cupples Sta | GPO | 0.50 | 10 / 5. Holidays (7). |  |  |
| GPO | Merchants Sta | 0.50 | 9 / 4. Holidays (7). |  |  |
| Merchants Sta | GPO | 0.50 | 9 / 5. Holidays (7). |  |  |
| GPO via Merchants Sta. | Bridge Sta | 0.76 | 2 / 1. Holiday (7). |  |  |
| Bridge Sta. via Merchants Sta | GPO | 0.76 | 1 |  |  |
| GPO | Bridge Sta | 0.60 | 3 / 2. Holidays (7). |  |  |
| Bridge Sta | GPO | 0.60 | 1. Holiday (7). |  |  |
| GPO | Progress | 0.70 | 8 / 4. Holidays (7). |  |  |
| Progress | GPO | 0.70 | 5 / 3. Holidays (7). |  |  |
| Progress Sta | Annex Sta | 0.60 | 2 |  |  |
| Merchants Sta. via Bridge Sta. | GPO | 0.76 | 2 / 2. Holidays (7). |  |  |
| 18th and Olive (345001) | Annex Sta | 0.50 | 3 |  |  |
| 18th and Clark (345001) | Annex Sta | 0.09 | 2 |  |  |

"Respectfully,

"(Signed)    JOSEPH STEWART,
"*Second Assistant Postmaster General.*"

letter carriers. The other was the heavy work of transporting all the arriving and departing mail of the city from the railway stations to the old Post Office and back again. On the one, the contractors received pay for every mile traveled. On the other, the pay was made dependent on the carriage of mail and no empty trips of going or returning were included in the mileage paid for although the schedule made many of them necessary. It is impossible, therefore, save by forcing, to adapt the rate per mile of one route to the other. What has been said shows how different was the equipment needed, how variant the tonnage carried, what disparity between the hours of readiness required, and the differing methods of calculating compensation. This substituted route was undoubtedly necessary in the transportation of mails in the City of St. Louis, but it was for a different purpose from that of the original route. The Department merely took advantage of general words in the appellants' contract to meet an emergency presented by the delay in finishing the new Post Office and the refusal of another contractor to continue this indispensable service beyond his term, to thrust this entirely new task upon the appellants here.

It is sought in the argument for the Government to distinguish this case from the *Stage Company Case* and the *Hunt Case,* on the ground that in them the compensation was for a lump sum, and the new work required was not to be paid for at all, while here the additional or variant work was to be done at a rate of so many cents per mile. We do not think this is a real difference. The radical change made in the character of the work to be done on the substituted route and the wholly inadequate price to be paid for it as found by the Court of Claims make the injustice just as clear as in the cited cases. We hold that the substitution of the new route and schedule for the one bid upon was not within the terms of the contract.

But it is said that, in view of the attitude of the Government, the conduct of the contractors constituted such an acceptance of the new route as within the original contract as to rebut any implication of a different contract for a reasonable price on the part of the Government. Consideration of this argument requires a review of the circumstances. The findings show that the advertisement for bids referred bidders to the city postmaster for any additional information concerning the matter, and that he advised these contractors when they doubted whether they could get their equipment ready by July 1st, that the new Post Office could not be completed at that time, that the work bid for could not begin then, and that the Department would take care of the situation. They, thereupon, made their bid, accompanying it as required with a bond for $25,000. The bid was accepted by the Department with a special notice as to the necessity of being ready with equipment July 1st, and enclosing the contract. The city postmaster being applied to again by the anxious bidders, assured them that the matter would be adjusted in due time and urged them to sign the contract. Accordingly, on May 22nd, the contractors signed and, on May 23rd, forwarded the contract to the Department with a request for extension of time. This was denied, and on application to the Department June 20th for relief because of the assurance of the postmaster, they were told that they would be given a substituted route then in the course of preparation. They objected that they could not prepare for this substituted route which as already said was a mere continuance of old service by another contractor. They were told that they must be ready for the restated route at the time appointed and on June 30th they were furnished with a schedule of the new service. The contractors protested to the Second Assistant Postmaster General, to the postmaster at St. Louis and to one Porter, a representative of the Department at

St. Louis, saying that they were not required to perform this service by the terms of the contract because it was entirely different from that contemplated; and that they would be ruined financially. Porter, whose authority is not otherwise shown, told them that his business was to see that the service commenced on July 1st, and if they did not begin, the contract would be readvertised and they would be sued on their bond. The contractors then hired the equipment and outfit of the old contractor, with the result already stated that they lost $19,500 in 16 months.

We think that there was no acceptance of the new route under the circumstances which would bar a recovery for what the services were reasonably worth. The *Hunt Case* was not a stronger case than this; and in the *Stage Company Case* the right to recover for work not properly and legally included in the contract was not even questioned, although in both cases the work demanded was done and periodical payments accepted. It is said on behalf of the Government that those cases are to be distinguished from this because the contractor was in the midst of his work under his contract and he could not be expected to throw it up with all the uncertainties and certain losses he would sustain, while here the contractors had not begun work or extended preparation. But while the cases are different, the difficulties faced by the contractors here were quite as formidable. They had been nursed into making the bid and giving the bond by the assurance as to the possible date of beginning the contract by the postmaster to whom they had been officially referred for information. They thus became bound under their bond to sign and complete the contract before they had been otherwise advised as to the actual date when their service would begin. At the time the contract was executed, the Department had formed the purpose to thrust on the contractors this burdensome route; but it

did not advise them of it until ten days before July 1st, and, indeed, did not give them the exact schedule until the day before they were to begin it. Then the only course open to them was either to engage the old contractor's equipment at a heavy loss or throw up the original contract and run the risk of the Government's reletting at a higher bid and charging the possible heavy difference in cost to it against them on their bond for a five-year contract. We can not ignore the suggestion of duress there was in the situation or the questionable fairness of the conduct of the Government, aside from the illegality of the construction of the contract insisted on, and have no difficulty, therefore, in distinguishing this case from the so-called *Railroad Mail Cases* (*Eastern R. R. Co.* v. *United States,* 129 U. S. 391; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *United States,* 198 U. S. 385; *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 225 U. S. 640; *New York, New Haven & Hartford R. R. Co.* v. *United States,* 251 U. S. 123; and *New York, New Haven & Hartford R. R. Co.* v. *United States,* 258 U. S. 32), which are cited on behalf of the United States.

We think that the contractors are entitled to recover the reasonable value of their services for the 16 months including a fair profit.

This relieves us of considering the conclusion reached by the Court of Claims.

The judgment is reversed, the cross appeal of the United States is dismissed, and the case is remanded to the Court of Claims, with directions to find the value of the services rendered by appellants on the substituted or restated route including a fair profit, and to enter judgment for the balance found due.

*Reversed.*