KING et al. v. ICKES, Secretary of the Interior.

No. 5612.

Court of Appeals of the District of Columbia.
Argued Jan. 4, 1933.
Decided April 3, 1933.

F. W. Clements, F. M. Goodwin, and L. H. Cake, all of Washington, D. C., for appellant.

O. H. Graves, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

This appeal is from a final decree dismissing a bill for injunction to restrain the Secretary of the Interior from exercising authority or control over certain accumulated rents and royalties derived from a certain oil lease, inherited by appellant from a full-blood Indian allottee, in the state of Oklahoma, and for a mandatory order requiring the Secretary to release and turn over the funds to plaintiff or her guardian.

It appears that prior to 1919 one Pottey, a full-blood Seminole Indian, roll No. 1447, received as his homestead allotment, under the Act of May 27, 1908, 35 Stat. 312, 40 acres of land in Seminole county, Okl., which was duly patented to him.

On June 18, 1923, with the consent and approval of the Secretary of the Interior, Pottey executed an oil and gas lease to the Creek Capital Oil Company for a term of ten years from November 25, 1919, or as much longer thereafter as oil and gas were found in paying quantities. Royalties accrued thereunder in the hands of the Secretary of the Interior to the approximate amount of $75,000. Pottey died December 1, 1926, intestate, leaving, as his heirs and next of kin, Nancy King, widow, Eliza Wolf, born prior to March 4, 1906, a daughter of a former wife, since deceased, and David Stamp, born after March 4, 1906, a son of the said former wife.

Upon the death of Pottey, the land did not descend to his heirs, but was subject to a proviso of section 9 of the act of Congress of April 12, 1926, 44 Stat. 239, as follows: "The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator: Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior for the use and support of such issue, during their life or lives, until April 26, 1931."

David Stamp died April 15, 1930, and the land descended to the remaining heirs of the original allottee, Nancy King and Eliza Wolf. Thereafter the two heirs, sold and conveyed all their interest in the land by deed duly approved by the county court of Seminole county, Okl., being the court having jurisdiction of the settlement of the estate of the deceased allottee. Neither of the heirs have now any interest in the land.

The present suit was brought by Nancy King, through her guardian, Hugh Barham, to recover her share of the moneys, rents, royalties, and profits derived from the land, and now in the possession of the defendant, the Secretary of the Interior, and retained by him subject to his control. Plaintiffs L. W. Cozart and Sampson B. Harjo, administrators of the estate of Pottey, were allowed to intervene.

The land in question was allotted under the Acts of March 1, 1901, 31 Stat. 861, and June 30, 1902, 32 Stat. 500, in both of which it was provided that the homestead of each allottee should be inalienable for twenty-one years, and on his death should remain for the use and support of his children, if any, born after the date which would entitle them to be enrolled and receive allotments of their own. By the act of April 26, 1906, 34 Stat. 137, this date was changed to March 4, 1906, and as to allotments to full-blood allottees the restrictions on alienation were extended until April 26, 1931, or twenty-five years. By the act of May 10, as amended May 24, 1928, 45 Stat. 495, 733, the restriction period was extended twenty-five years to terminate April 26, 1956.

It is undisputed that the restriction fixed by statute continued while the land was owned by the original allottee, and that all income therefrom was property held by the Secretary as a restricted fund, and that upon the death of the allottee the homestead land and the income derived therefrom was subject, until April 26, 1931, to the special estate created in David Stamp, if he survived that date. Stamp, however, died prior to 1931, and the special estate was thereby terminated, and the land descended to the remaining heirs, Nancy King and Eliza Wolf.

So long as the title remained in the two surviving heirs, the land and the accumulated income remained subject to the restrictions. These restrictions, however, upon the sale of the land with the approval of the county court, were removed, and the point here in controversy is the status of the fund which had accumulated in the hands of the Secretary of the Interior when the restrictions upon the disposition of the land were removed. In other words, it is conceded, as it must be, that the land, at the time this suit was brought, was unrestricted, but it is contended by the Secretary that the income derived from the royalties, until the restrictions are removed, is separate and apart from the land and still remains under his control, for the use and benefit of the heirs, until the expiration of the extended restriction period.

Since this case was argued in this court, Congress by the Act of January 27, 1933, provided in part as follows: "That all funds and other securities now held by or which may hereafter come under the supervision of the Secretary of the Interior, belonging to and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unen- rolled, are hereby declared to be restricted and shall remain subject to the jurisdiction of said Secretary until April 26, 1956, subject to expenditure in the meantime for the use and benefit of the individual Indians to whom such funds and securities belong, under such rules and regulations as said Secretary may prescribe."

The act then provides that the restriction shall extend to lands belonging to the Indians under certain circumstances and conditions, not important here, since we are dealing with funds in the hands of the Secretary accumulated from the oil lease and not lands. The act further provides for the creation of trusts in Indian funds, with the approval and under the supervision of the Secretary of the Interior, with the provision that such trust agreements shall not "be in any manner released during the continuance of the restriction period now or hereafter provided by law, except as provided by the terms of such agreement or contract, and neither the corpus of said trust nor the income derived therefrom shall, during the restriction period provided by law, be subject to alienation, or encumbrance, nor to the satisfaction of any debt or other liability of any beneficiary of such trust during the said restriction period."

The terms of the act are broad and sweeping, intended, we think, to embrace the general supervision and control of all funds and other securities now held by the Secretary of the Interior and belonging to Indians of one-half or more Indian blood of the Five Civilized Tribes. This is merely another instance of the exercise by Congress of its plenary power of guardianship over the Indians and their property.

In the case of Brader v. James, 246 U. S. 88, 38 S. Ct. 285, 286, 62 L. Ed. 591, the court was considering whether or not unrestricted land owned by a full-blood Choctaw Indian came under the provisions of the Restriction Act of April 26, 1906, 34 Stat. 137. On this point the court said: "Notwithstanding Rachel James might have conveyed the homestead allotment after it descended to her, she was a tribal Indian, and as such still subject to the legislation of Congress enacted in discharge of the nation's duty of guardianship over the Indians. Congress was itself the judge of the necessity of legislation for this purpose; it alone might determine when this guardianship should cease."

The mere fact that appellant Nancy King had exercised the right, under approval of the county court, to sell her land and thereby remove it from all restrictions, or that by

removal of the restrictions she may have been entitled to have the funds derived from the leases on the land turned over by the Secretary of the Interior to her guardian as part of her estate, does not, we think, affect the present status of this case. The sale of the land can only be urged here as affecting the removal of the restrictions which unquestionably existed from the death of Stamp, and which may have operated to remove the restrictions on the fund in the hands of the Secretary. The fact, however, remains that the fund, wherever located, is the property of the Indian, and whether restricted or unrestricted, after the restrictions upon the land were removed, lawfully came into the hands of the Secretary to be held by him until the question of whether it was restricted or unrestricted had been adjudicated either by the courts or by act of Congress. The plenary power of Congress over the Indians and their property is so definitely settled that the power conferred by the present act to restrict this fund until the end of the restriction period cannot be questioned.

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes." United States v. Kagama, 118 U. S. 375, 384, 6 S. Ct. 1109, 1114, 30 L. Ed. 228.

In Lone Wolf v. Hitchcock, 187 U. S. 553, 565, 23 S. Ct. 216, 221, 47 L. Ed. 299, the court, defining the scope of the plenary authority of the government over the Indians, said: "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."

In the case of Tiger v. Western Investment Company, 221 U. S. 286, 315, 31 S. Ct. 578, 586, 55 L. Ed. 738, the court, after citing and discussing many decisions relating to the extent of the plenary power of Congress in the exercise of its guardianship over the Indians, said: "Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage."

We are not concerned here with the sale of the land by approval of the Oklahoma court, and the appointment of a guardian for appellant Nancy King by the same court. The question of the power of Congress to transfer the proceeds from the sale of the land into the custody of the Secretary of the Interior is not here involved. We are concerned only with the funds derived from the oil lease and now in the possession of the Secretary. These have never fallen within the jurisdiction of the Oklahoma court. The present action is to secure a transfer from the Secretary to the jurisdiction of the court.

The sweeping power of Congress in its general guardianship over the Indian is illustrated in the case of Sunderland v. United States, 266 U. S. 226, 45 S. Ct. 64, 69 L. Ed. 259, where one Perryman, a half-blood Creek Indian, was allotted a homestead with restrictions against alienation until April 26, 1931. The restrictions were subject to removal by the Secretary of the Interior "under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe." On application the restrictions were removed from a portion of the homestead by the Secretary which was sold, and a portion of the proceeds used to purchase another tract of land. The purchase was approved by the Secretary on condition that the deed contain a clause restricting the alienation of the land so purchased until April 26, 1931, "unless made with the consent of and approved by the Secretary of the Interior." The deed was made and recorded in Oklahoma, and the Indian allottee thereafter, without consent of the Secretary, sold and conveyed the land to Sunderland.

A decree was thereafter obtained from an Oklahoma court against Perryman, quieting title in Sunderland. The United States then brought suit in the United States District Court for Oklahoma to cancel and set aside the conveyance and annul the decree of the state court. A decree was accordingly entered, and, on appeal to the Supreme Court, affirmed. It was contended that Congress was without power to impose restrictions upon the sale of lands within a state which had passed into private ownership. The power of Congress therefore was directly challenged on the ground that the land which had passed

into private ownership was subject to the jurisdiction of the state of Oklahoma, and was exclusively within the control of its laws.

The court, upholding the authority of Congress, said: "We do not doubt the power of the United States to impose such a restraint upon the sale of the lands of its Indian wards, whether acquired by private purchase and generally subject to state control or not. Such power rests upon the dependent character of the Indians, their recognized inability to safely conduct business affairs, and the peculiar duty of the federal government to safeguard their interests and protect them against the greed of others and their own improvidence. * * * When the general protective policy of Congress in dealing with the Indians is borne in mind, it reasonably cannot be doubted that the authority conferred upon the Secretary to make rules concerning the 'disposal of the proceeds for the benefit of the respective Indians' is broad enough to justify the rule in question. Since the allotted lands could not be sold or encumbered without his consent, and since the proceeds of any sale thereof were subject to his control and could only be disposed of with his approval and under such rules as he might prescribe for the benefit of the respective Indians, the extension of such control to the property in which the proceeds were directly invested would seem to be within the statute fairly construed. Indeed, we think the authority of the Secretary to withhold his consent to the proposed investment of the proceeds subject to his control, includes the lesser authority to allow the investment upon condition that the property into which the proceeds are converted shall be impressed with a like control."

If Congress, in the exercise of its guardianship, can go to the extent approved in the Sunderland Case, we find no difficulty in applying the act here in question to the disposition of the funds in the possession of the Secretary. They came into his possession in the lawful course of his supervisory power over the lands in question, and were still in his possession at the time the act of Congress was passed. Assuming, therefore, without deciding, that technically the jurisdiction over this fund passed to the Oklahoma court with the removal of the restrictions upon the land, the court had not acquired such jurisdiction as to place the fund beyond the control and power of Congress to further restrict it in the hands of the Secretary.

The decree is affirmed.