**UNITED STATES ex rel. WARREN v. ICKES, Secretary of the Interior, et al.**

No. 6270.

United States Court of Appeals for the District of Columbia.

Argued Oct. 12, 1934.

Decided Nov. 5, 1934.

C. H. Merillat, of Washington, D. C., for appellant.

J. Kennard Cheadle, of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

This suit was brought in the Supreme Court of the District of Columbia by petitioner Frank L. Warren to secure a writ of mandamus commanding the defendants Harold L. Ickes, Secretary of the Interior, and John Collier, Commissioner of Indian Affairs, to pay to the plaintiff the sum of $8,586.72, with interest, from funds derived from oil and gas royalties and now held by the Secretary.

It appears that one Tersey Baker, a full-blood Creek Indian, one of the Five Civilized Tribes, was allotted a homestead in Hughes county, Okl. This homestead was subject to the restrictions imposed by section 1 of the Act of Congress of May 27, 1908, 35 Stat. 312, which, among other things, provides: "All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe."

Baker died March 15, 1911, leaving as his heirs Betsy Harjo, his widow, and Joseph Harjo, his son, born after March 4, 1906. On the death of Baker the homestead became subject to the restrictions provided in section 9 of the 1908 act (35 Stat. 315), as amended by the Act of April 12, 1926, 44 Stat. 239, as follows: "The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator: Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior for the use and support of such issue, during their life or lives, until April 26, 1931; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from restrictions; if this be not done, or in the event the issue hereinabove provided for die before April 26, 1931, the land shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions."

It will be observed that the death of Baker left the homestead subject to a special estate in favor of Joseph Harjo, who was born after March 4, 1906. This special estate rendered the homestead inalienable during Joseph Harjo's life, or until April 26, 1931. Joseph Harjo died October 15, 1930, and left as his sole heir his mother, Betsy Harjo. With his death all legal restrictions were lifted from the original Baker homestead and the oil and gas royalties that had been derived therefrom.

On October 28, 1915, Betsy Harjo, acting for herself and in behalf of her son Joseph Harjo, executed an oil and gas lease of the restricted homestead, with the approval of the Secretary of the Interior. The accumulated royalties from the oil lease at the time of Joseph Harjo's death amounted to approximately $50,000, and were, and now are, held by the Secretary of the Interior.

Probate proceedings under the Oklahoma law were instituted in the county court of Hughes county, Okl., where Betsy Harjo petitioned the probate court to decree her as the sole heir of Joseph Harjo's estate. Subsequently, one Addie Mingo, and her child, Mary Ellen Mingo, answered Betsy Harjo's petition, and filed a cross-petition asking the court to decree them, as the widow and child of Joseph Harjo, to be his sole surviving heirs.

Betsy Harjo thereupon employed the petitioner, Frank L. Warren, as her attorney to represent her in the suit against the Joseph Harjo estate. Betsy Harjo and Warren entered into a written contract on July 15,

1931, by the terms of which Warren was to receive for his services one-third of the land and funds involved in the estate of Joseph Harjo and one-third of the amount involved in a damage suit pending against the Joseph Harjo estate. This contract was approved by the county judge. Betsy Harjo, through the efforts of Warren, her attorney, was successful in this litigation; and a decree was entered that Addie Mingo and Mary Ellen Mingo take nothing by their answer and cross-petition, and that they have no right, title, or interest in the Joseph Harjo estate.

Pursuant to the contract of employment and the successful termination of the litigation, Betsy Harjo, on October 26, 1932, deeded to Warren a one-sixth interest in the Tersey Baker homestead; this being one-third of Joseph Harjo's one-half which was involved in the litigation. On the same date Betsy Harjo gave to Warren a mortgage on the remaining five-sixths of the Tersey Baker homestead to secure the payment of a promissory note, dated October 15, 1932, executed by her in the sum of $8,586.72, payable to Warren, and due April 25, 1933, with interest at the rate of 10 per cent. from date. This note represented one-third of the amount of Joseph Harjo's share of the funds derived from the oil royalties which were involved in the litigation. Both the deed and mortgage were approved by the Oklahoma county court. A demand was made of the defendants by Frank L. Warren on October 7, 1932, for payment of his claim against Betsy Harjo of $8,586.72; and on August 23, 1933, Betsy Harjo, by letter, requested the defendants to pay this claim.

The defendants refused to pay Warren's claim on the ground that the funds were restricted by the Act of Congress of January 27, 1933, 47 Stat. 777, and were to be disbursed for the benefit of the Indian owner as the Secretary in his discretion might determine. The act, among other things, provides: "That all funds and other securities now held by or which may hereafter come under the supervision of the Secretary of the Interior, belonging to and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unenrolled, are hereby declared to be restricted and shall remain subject to the jurisdiction of said Secretary until April 26, 1956, subject to expenditure in the meantime for the use and benefit of the individual Indians to whom such funds and securities belong, under such rules and regulations as said Secretary may prescribe."

The petitioner asserts that by virtue of his contract and the fulfillment of his agreement he acquired a vested right to a one-third interest in the fund belonging to the estate of Joseph Harjo, deceased. He bases his claim on the ground that by virtue of his employment he acquired a lien on the funds under sections 4204 and 4205 of the Laws of the State of Oklahoma (1931); and further that such contract and agreement constituted an equitable assignment to him of a one-third interest in the subject-matter of the litigation; and, finally, that the letter of August 23, 1933, written by Betsy Harjo to the Commissioner of Indian Affairs, wherein she requested the payment to the petitioner of the amount due under his contract of employment constituted an assignment to the petitioner of one-third interest in the fund.

The lease in this case was subject to the rules and regulations promulgated by the Secretary of the Interior governing oil and gas leases. These regulations provided that the disbursement of funds accumulated from royalties to the Indian lessor, or his heirs, should be entirely within the discretion of the Secretary of the Interior; and provided: "That from the individual Indian restricted funds derived as royalties or otherwise no disbursements in settlement of litigation or in payment of attorney's fees * * * shall be made except with the approval of the Secretary of the Interior thereto."

The lease, however, contained a provision to the effect that if restrictions on alienation were removed from the leasehold premises "this lease shall be released from the supervision of the Secretary of the Interior, such release to take effect without further agreement, from the date such restrictions are removed, and thereupon the authority and power delegated to the Secretary of the Interior as herein provided shall cease."

■ Under this clause of the lease the supervision of the Secretary over the royalties collected under the lease automatically ceased with the removal of the restrictions which occurred on the death of Joseph Harjo and the termination of the special estate. The regulation above cited as to the payment of attorney's fees could only apply to funds collected while the land was under restriction. The royalties are to be treated as composing a part of the restricted homestead estate; hence the removal of the restrictions from the homestead carries with it the full release of the funds accrued from oil and gas royalties. In the case of Parker v. Riley, 250

U. S. 66, 70, 39 S. Ct. 405, 406, 63 L. Ed. 847, the court, considering a lease and the rights acquired under it where the special estate of a minor was involved, as in the instant case, said: "The oil and gas lease was to run for 10 years and as much longer as oil or gas was found in paying quantity. * * * The oil and gas were to be extracted and taken by the lessee, and for this royalties in money were to be paid. These minerals were part of the homestead, and the lease was to operate as a sale of them as and when they were extracted. In that sense the heirs were exchanging a part of the homestead for the money paid as royalties, but no heir was surrendering any right to the others. Thus the rights of all in the royalties were the same as in the homestead. Nothing in the Act of May 27, 1908, makes to the contrary."

■ With the removal of the restrictions, the land, together with the accumulated oil and gas royalties in the hands of the Secretary, became part of the unrestricted estate, and supervision over those funds ceased. On removal of the restrictions the owner of the land and the funds was at full liberty to use, dispose of, and contract with relation to them in his or her individual capacity, without reference to approval or disapproval of the Secretary of the Interior, subject only to approval of the court of competent jurisdiction, in this instance the county court of Hughes county, Okl.

We are little concerned with the question whether or not, under the Oklahoma law, the services rendered by Warren created a lien against the land and funds here involved. It may be observed, however, that while it has been held by the courts of Oklahoma that such a lien can only be created where the attorney is acting in an affirmative case for the recovery of property (Elliott v. Orton, 69 Okl. 233, 171 P. 1110, L. R. A. 1918E, 103; Holloway v. Wright, 91 Okl. 57; 215 P. 937), the services here rendered were not in defense of any right claimed by Betsy Harjo, but in an affirmative action to have her right to the property derived from the estate of Joseph Harjo, her son, decreed to her. The claim of each litigant in that action was of an affirmative nature and not defensive, and hence the property acquired through the litigation would be subject, were it here material, to a lien under the Oklahoma law and the decisions of the Oklahoma courts.

■ That the assignment of a one-third interest in the property involved by the contract created, irrespective of the Oklahoma statutes, an equitable lien is well settled. In the case of Ingersoll v. Coram, 211 U. S. 335, 29 S. Ct. 92, 100, 53 L. Ed. 208, Ingersoll had a written contract for a fee agreed upon "in case the will is defeated and our clients get their shares." The contest in regard to the will was ultimately settled by compromise. Ingersoll, in the event of success, was to be paid "out of the funds secured from the estate." The court, disposing of the case, among other things said: "It is evident, therefore, that Ingersoll asked for security in a definite and written form. We do not think it can be said that he sought only a promise to pay. That followed from his employment. * * * In Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865, it was held that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligations, creates an equitable lien on the property so indicated."

Since the land in question and the funds in the hands of the Secretary of the Interior were released from all restrictions upon the death of Joseph Harjo, this case can be rested upon the validity and enforceability of the contract. This was a valid contract made and entered into by parties competent to contract, involving the disposition of property upon which no restrictions existed at the time the litigation closed, and the decree became final in October, 1932, establishing Betsy Harjo's right to the property involved.

The title to the money in question in the hands of the Secretary of the Interior passed from Betsy Harjo to Warren, and the terms of the contract were completely confirmed and fulfilled with the entry of the decree of the court fixing the estate of Joseph Harjo in Betsy Harjo, the deeding of the land to Warren, the execution of the mortgage to secure the payment of the money in the hands of the Secretary by Betsy Harjo on October 26, 1932, and the simultaneous demand by Warren on the Secretary to pay the money to him.

■ The title to the money in the hands of the Secretary of the Interior having passed from Betsy Harjo and become vested in Warren, it was beyond the power of Congress by the later Act of January, 1933, to place any restriction upon the disposition of this money in the hands of the Secretary. Of course, whatever money remained in the hands of the Secretary, which was the property of

Betsy Harjo at the time of the passage of the act of Congress restricting it, is properly held by the Secretary as restricted funds; but on no principle of law or justice could this act be interpreted as extending to the funds contracted away by Betsy Harjo and held by the Secretary as the property of Warren.

At this point the King (62 App. D. C. 83, 64 F.(2d) 979) and Perry (62 App. D. C. 86, 64 F.(2d) 982) Cases may be distinguished from the instant case. In King v. Ickes, 62 App. D. C. 83, 64 F.(2d) 979, Nancy King, an Indian, through her guardian, seeking to restrain the Secretary from exercising further control over funds she had inherited, petitioned the court for a mandatory injunction to require the Secretary to release the funds to her guardian. It was held that while the funds inherited were unrestricted, they were still in the possession of the Secretary upon the passage of the 1933 Restriction Act; and that, since the funds belonged to an Indian, it was within the power of Congress, in the exercise of its guardianship over the Indian, to restrict them.

In the case of Ickes v. United States ex rel. Perry, 62 App. D. C. 86, 64 F.(2d) 982, Perry, an Indian, petitioned for a writ of mandamus to compel the Secretary to turn over to his guardian funds which he had inherited, and which at the time of inheritance were unrestricted, but at the time of the passage of the 1933 act were still in the possession of the Secretary. The decision in this case followed the ruling in the King Case.

It will be observed that these cases are very different from the one at bar. There the title to the funds remained in an Indian; and Congress, in exercising its powers of guardianship over its Indian wards, had the power to restrict funds belonging to the Indians, found in the possession of the Secretary of the Interior. Here, however, at the time of the passage of the Restriction Act of 1933, the funds in question no longer belonged to Betsy Harjo, the Indian, but were the property of Warren. Title having passed from the Indian and become completely vested in Warren, no power resided in Congress or the Secretary to withhold the payment of the funds to Warren.

Nor is the right of Warren to recover affected by the giving of a mortgage by Betsy Harjo to Warren upon the land owned by her as security for the payment of a sum equal to the amount withheld by the Secretary, since, according to the undisputed evidence, this mortgage was given with the understanding that every effort should be made on the part of the contracting parties to procure the money involved from the funds in the hands of the Secretary of the Interior; and only upon failure to so secure the funds should the mortgage be satisfied by Betsy Harjo or foreclosed by Warren. It, therefore, amounted to nothing more than collateral security for payment of the valid lien against the fund created by the contract; and, until the principal claim is exhausted, the collateral would not become available.

The mortgage at most could not be regarded as more than a concurrent remedy available to Warren, and in the enforcement of which he could not be held to any rule of election. "Where the law furnishes a party with two or more concurrent and consistent remedies he may prosecute one or all until satisfaction is had." 20 Corpus Juris 6, § 7. Of course, in the event of the recovery of the funds from the Secretary, Warren would be required to discharge of record the mortgage, and surrender the note secured thereby; but the acceptance of the note and mortgage in no way foreclosed the right of Warren to pursue and recover the funds in the hands of the Secretary.

Again we are confronted by the usual plea made in these cases by government counsel that this is a suit against the United States. The United States is in no way involved in this controversy. The funds in the hands of the Secretary do not belong to the Indian Harjo, nor are they property over which the government could exercise guardianship or control in any manner whatever. We are dealing here with a valid lien created by contract under which Warren acquired vested rights in the funds in question, of which he could not be constitutionally deprived by any action of Congress or the government of the United States. The principal sum of money contracted to be paid is wrongfully held by the Secretary, and there is nothing left but the plain ministerial duty imposed upon him of paying it over to Warren. This duty the courts will enforce by the customary writ of mandamus.

In Houston v. Ormes, 252 U. S. 469, 472, 40 S. Ct. 369, 370, 64 L. Ed. 667, the court, holding that a suit by a person entitled to the performance of a duty imposed upon an official of the United States is not a suit against the government, said: "In Minnesota v. Hitchcock, 185 U. S. 373, 386, 22 S. Ct. 650, 655, 46 L. Ed. 954, while holding that a suit against officers of the United

States might be in effect a suit against the United States, the court said: 'Of course, this statement has no reference to and does not include those cases in which officers of the United States are sued, in appropriate form, to compel them to perform some ministerial duty imposed upon them by law, and which they wrongfully neglect or refuse to perform. Such suits would not be deemed suits against the United States within the rule that the government cannot be sued except by its consent.'"

The judgment of the court below is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.