### BAZE v. SCOTT et al.
### No. 6611.

District Court, E. D. Oklahoma.

Oct. 4, 1938.

Earl G. Anthis and Forrester Brewster, both of Muskogee, Okl., for plaintiff.

W. F. Semple, of Tulsa, Okl., and Ferguson & Hagood, of Durant, Okl., for defendant Lonie Scott and guardian of Lonie Scott.

Utterback, Stinson & Utterback, of Durant, Okl., for Durant Nat. Bank, Durant, Okl.

Nate Gibson, Jr., of Muskogee, Okl., as guardian ad litem for Lonie Scott.

Charles N. Champion, Asst. U. S. Atty., of Muskogee, Okl., for intervener.

RICE, District Judge.

This case involves the disposition of oil and gas royalties derived from the homestead allotment of a deceased fullblood Indian leaving heirs born after March 4, 1906, under Section 9 of the Act of May 27, 1908, 35 Stat. 312, 315.

The essential facts for a determination of the question involved were agreed upon. Hickman Willis, the allottee, was a fullblood Mississippi Choctaw Indian. He died on July 17, 1925, and left surviving the plaintiff, born after March 4, 1906, and the defendant Lonie Scott, born prior to March 4, 1906. The oil and gas lease was executed by Hickman Willis during his lifetime. Oil and gas was being produced from the homestead at the time of his death. Between the date of his death and April 26, 1931, the oil and gas royalties collected by the Department of the Interior, acting through the Superintendent for the Five Civilized Tribes, amounted to $73,-869.31. The interest derived from an investment of the royalties, as collected, amounted to $9,277.24.

On June 20, 1932, the Superintendent for the Five Civilized Tribes apportioned the moneys by him collected as follows: $9,277.24 representing the interest was apportioned to the plaintiff. The $73,869.31 was apportioned to the plaintiff and the defendant equally.

The plaintiff's interest in said apportionment was retained by the Superintendent for the Five Civilized Tribes. The apportionment of the defendant, Lonie Scott, was paid to her legal guardian W. W. Pierce and at the time of this trial $26,203.08 of said amount was on deposit in the Durant National Bank, Durant, Oklahoma. The suit is against Lonie Scott and her guardian W. W. Pierce and the Durant National Bank, Durant, Oklahoma, the bank being made a party for the purpose of subjecting the funds on deposit therein to any judgment that may be obtained by the plaintiff herein.

The United States Government has intervened in this cause and contends that under the law the distribution made by the Department of the Interior of the oil and gas royalties is proper.

Some contention is made that the plaintiff is barred by the statute of limitations from maintaining this action, the suit having been filed on November 6, 1937. The facts developed upon the trial did not sustain the plea of the statute of limitations.

The real question for determination in this case is whether or not the rule announced in the case of Parker et al. v. Riley et al., 250 U.S. 66, 39 S.Ct. 405, 63 L.Ed. 847, is to be applied to the facts in this case. The difference between the facts in Parker v. Riley, supra, and this case is that in Parker v. Riley, supra, the oil and gas lease was executed by the heirs of the deceased allottee, including the issue born after March 4, 1906, whereas in this case the oil and gas lease was executed by the allottee prior to his death.

Section 9 of the Act of May 27, 1908, 35 Stat. 312, 315, is as follows: "That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee: Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-sixth, nineteen hundred and thirty-one; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions: Provided further, That the provisions of section twenty-three of the act of April twenty-sixth, nineteen hundred and six, as amended by this act, are hereby made applicable to all wills executed under this section."

The rule announced in Parker v. Riley, supra, is as follows [page 406]: "Under the provision in section nine specially providing for issue born after March 4, 1906, Julia was entitled for her support to the exclusive use of the entire homestead while she lived, but not beyond April 26, 1931, and those who took the fee took it subject to that right. The rights of all in the royalties must, as we think, be measured by that standard. In this view Julia is entitled to the use of the royalties, that is to say, the interest or income which may be obtained by properly investing them, during the same period, leaving the principal, like the homestead, to go to the heirs in general on the termination of her special right."

The plaintiff concedes that, if the rule as announced in Parker v. Riley, supra, is to be applied in this case, the distribution of the funds made by the Superintendent for the Five Civilized Tribes was proper and she is not entitled to recover in this action. But plaintiff contends that the rule in Parker v. Riley, supra, is not applicable herein; for the reason that the oil and gas lease under which production was obtained was executed by the allottee during his lifetime and oil and gas was being produced from the homestead at the time of his death. This seems to be a new contention so far as the reported cases arising under the Act of Congress in question are concerned.

The basis in law for the plaintiff's contention is stated in her brief as follows:

"Plaintiff seeks the application of the rule applicable to a life tenant referred to as the 'Open Mine' doctrine. The rule is thus stated in 17 R.C.L. 634 paragraph 24, as follows:

"'With respect to the rights of a life tenant in minerals under the surface, a distinction is made between the operation of mines which have been opened and those which have not been opened at the inception of the life tenancy. It is well settled that a life tenant has no interest in and no right to open and work unopened mines, on the ground that such action would be a lasting injury to the inheritance. Nor can he give such right to another by lease, and if he attempts to do so, he cannot enforce the covenants of the lease. So, if a mine has been opened and then definitely abandoned by the owner of the fee prior to the commencement of the life tenancy, it would seem that the life tenant has no right to renew operations. On the other hand, it is equally well settled that a tenant for life may continue to work mines that were open when the tenancy commenced, and in doing so may construct new approaches, and may even work the mine to exhaustion. The rule is based on the theory that in such cases mining is a mere

mode of use and enjoyment, and to extract minerals from an open mine is but to take the accruing profits of the land. The rents derived from the lease of an open mine are income to which the life tenant is entitled, and where the right to operate unopened mines is given by lease executed by the life tenant with the consent and joinder of the remainderman it has been held that the life tenant is entitled to have the rental or royalties invested and the income therefrom paid to him for life. The foregoing principles apply to oil and gas found in the land as well as to the solid minerals.' "

This general statement of the law is generally supported by the decisions. Higgins Oil & Fuel Co. v. Snow et al., 5 Cir., 113 F. 433.

In support of her theory the plaintiff cites the decisions of the Supreme Court of Oklahoma dealing with the oil and gas royalties derived from the homestead. Although the Oklahoma Supreme Court has never defined the homestead right as a life estate it has held that: "The rights of the widow and minor children during the time the land is used and occupied as such homestead are to be determined by the same rules which have determined the rights of a life tenant." Lawley v. Richardson, 101 Okl. 40, 223 P. 156, 157, 43 A.L.R. 803.

In discussing the nature of the homestead right the Oklahoma Supreme Court, in Pettis v. Johnston, 78 Okl. 277, 190 P. 681, has used the following language [page 683]: "The homestead interest is jointly vested in the husband and wife for the benefit of themselves and family, without regard to which spouse owns the title to the land; the homestead interest is a creature of the Constitution and statutes, nothing like it being known at common law; it is a special and peculiar interest in real estate; it is not a mere inchoate interest in either spouse, to become vested upon the death of the other; this joint right is paramount to the individual rights of either, and, being incapable of division and partition between husband and wife, it cleaves and adheres so closely to the title to the land itself that it cannot be dissociated therefrom by a mortgage foreclosure sale under a court decree to which either husband or wife is not a party."

■ Oil and gas royalties from the homestead under the Oklahoma law are disposed of in accordance with the contention of the plaintiff. Tarman v. Pierce, 168 Okl. 348,

33 P.2d 203; Lusk v. Carter Oil Co., 172 Okl. 508, 53 P.2d 656; Hembree v. Magnolia Petroleum Co., 176 Okl. 524, 56 P.2d 851.

But we are not now concerned primarily with the rights of a life tenant under the common law, nor with the rights of a surviving spouse and minor children in a homestead created under the Constitution and statutes of the State of Oklahoma. The rights of the plaintiff in the homestead allotment of the deceased allottee were granted under, and are to be measured by, the Act of Congress (Section 9, Act of May 27, 1908, 35 Stat. 312, 315) and we are now primarily concerned with a construction of that act as applied to the facts in this case.

■ In construing an act of Congress courts should, and do, keep in mind the general design and purpose of the act. The act is viewed in its entirety and the intent of the legislative body where plainly discernible from the act considered as a whole will prevail over the literal import of words employed. The paramount question always is, what did Congress intend? Darby-Lynde Co. v. Alexander, 10 Cir., 51 F.2d 56; Holmes v. United States, 10 Cir., 53 F.2d 960.

The first section of the Act of May 27, 1908, 35 Stat. 312, is as follows: "That from and after sixty days from the date of this Act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: * * *."

■ A careful reading of the entire act shows that Congress was not concerned with the creation of estates but was dealing with the question of restrictions and alienation. Judge Sanborn, of the Circuit Court, in his opinion in Parker v. Riley, 8 Cir., 243 F. 42, used the following language [page 48]: "* * * a careful study of section 9 has satisfied that the homestead right of Julia Willingham in reality never rose to the dignity of an estate for life in any part of the land allotted to Emma Derrisaw. The purpose and effect of the act of July 28, 1908, was not to create estates, but to limit the extent of and to remove restrictions upon alienation."

The Supreme Court of the United States in Parker v. Riley, supra, said: "We need not stop to consider whether,

strictly speaking, the right thus specially given to Julia was an estate for life or for years; for it evidently was not the purpose to make any nice distinctions along that line."

Judge Williams in United States v. Martin, D.C., 45 F.2d 836, in construing the act in question said [page 840]: "* * * it was the purpose of Congress to protect the wards of a dependent nation of Indians, and it being the intention to hold the corpus or homestead during the life of the heir, or child born after March 4, 1906, until April 26, 1931, .as a trust for the benefit of such heir * * *."

And again he said: "Further, in event such homestead should produce an income *in excess of the reasonable needs of said heir or heirs born after March 4, 1906,* [italics supplied] the Secretary of the Interior might remove restrictions from a portion of it and distribute same to the heirs."

This clearly recognizes the purpose of the act to be to provide an assured income or means of livelihood for the heir or heirs born too late to receive an allotment of their own, but preserving the corpus of the estate for distribution after April 26, 1931, or after the death of the heirs born subsequent to March 4, 1906.

It is a matter of common knowledge that to apply the rule as contended for by the plaintiff would in many instances result in enriching the heir born after March 4, 1906, and leaving the other heirs in poverty, for in many instances oil and gas development on the homesteads of allottees had ceased prior to April 26, 1931. It *may well be doubted that Congress intend-*ed by providing in Section 9 in the act mentioned for the heir born after March 4, 1906, to enrich him far beyond the other heirs of said allottee.

No court has ever attempted definitely to classify according to the common law classifications the estates of the heirs coming within the provisions of Section 9 of said act. The terms "life estate", "estate for years", "fee simple" and "remainder" had clearcut and definite meanings at common law. Had Congress desired to carve out such estates apt language for such purpose could have been used. No such language was used and whatever interest in the land was created under this section of the act was unknown at common law.

The particular section of the act now under consideration has been before the courts in numerous cases. Grisso v. Milsey, 104 Okl. 173, 178, 230 P. 883; Johnson v. U. S., 10 Cir., 64 F.2d 674; Holmes v. U. S., 10 Cir., 53 F.2d 960; U. S. ex rel. Warren v. Ickes, Secy. Interior, 64 App. D.C. 27, 73 F.2d 844. And others. Each time the decision turned upon the question of restrictions. Always the court refrained from defining the precise nature of the estates of the respective heirs. The interest of the heir born after March 4, 1906, is most frequently referred to as a "special estate", and in carrying out the declared intention of Congress the courts have held that none of the heirs had any interest in the homestead allotment subject to alienation prior to April 26, 1931, except upon the death of the issue born after March 4, 1906, or upon removal of restrictions by the Secretary of the Interior.

In Rogers v. Rogers, D.C., 263 F. 160, the facts, insofar as the legal question involved, were identical with the facts in this case. Therein it was said [page 161]: "As to the royalties derived from the homestead, the said Hazel Rogers and Levi T. Rogers, Jr., are entitled to the use of the interest or income which may be obtained by properly investing the same during their lives, until April 26, 1931, leaving the principal to go to the heirs in general on the termination of their special right; their guardian, appointed in the state probate court, not being entitled to the custody of such royalties without the consent of the Secretary of the Interior." Citing Parker v. Riley, 250 U.S. 66, 39 S. Ct. 405, 63 L.Ed. 847.

In Johnson v. U. S., 10 Cir., 64 F.2d 674, the rule announced for the disposition of oil and gas royalties in Parker v. Riley, supra, is recognized. In that case Ella Williams, a ¾ blood Chickasaw, was allotted the land as her homestead. In 1913 she executed an oil and gas lease upon the homestead with the approval of the Secretary of the Interior. She died in 1916 leaving, among other heirs, one child Cecil born after March 4, 1906. In the opinion Judge McDermott states [page 675]: "The issue is further narrowed by the pleadings of the adverse claimants. Each expressly acknowledges the right of Cecil to the exclusive enjoyment of the homestead, and to the use of the royalties, until April 26, 1931, as determined in

Parker v. Riley, 250 U.S. 66, 39 S.Ct. 405, 63 L.Ed. 847."

Parker v. Riley, supra, was not decided upon the character of the estate created by Section 9. The trial court, the Circuit Court of Appeals, and the Supreme Court, each had before it the character of the estate involved and could have based the decision upon that but failed to do so. The principle of law invoked by plaintiff pertaining to life estates and the "open mine" doctrine was well settled at the time of the Parker v. Riley decision.

After the decision in Parker v. Riley, supra, the Department of the Interior in administering the estates of deceased Indians, and in disbursing oil and gas royalties derived from the homestead allotments coming within the provision of Section 9, followed the rule announced by the Supreme Court. The Department did this in all cases, making no distinction based on the date of the oil and gas lease, whether given before or after the death of the allottee. Under the circumstances the interpretation of the act by the Department charged with its administration over a period of nineteen years is entitled to great weight. Taylor v. Tayrien, 10 Cir., 51 F.2d 884, 885.

No justification for distinguishing this case from Parker v. Riley, supra, is found in the language of the Act of Congress or any decision of any court construing said act.